Exhibit 1

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\* \* \* \* \*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | \* | NO. 4:25-CR-399 |
| | \* | |
| VS. | \* | |
| | \* | |
| RAUL A. RAMIREZ CORREA (1) | \* | |
| CESAR O CABEZAS PACHECO (2) | \* | |
| PETER DAVILA NUNEZ (3) | \* | Houston, Texas |
| OTIS J. RODRIGUEZ GARCIA (4) | \* | |
| DANY E. ROJAS (5) | \* | |
| PEDRO HERNANDEZ DELGADO (6) | \* | |
| ARCHERLIN ISMAEL L. BERBIN (7) | \* | |
| JESUS HERNANDEZ TROCONIZ (8) | \* | 10:36 - 12:44 a.m. |
| EMBEER GUTIERREZ TERNAWSKY (9) | \* | July 7, 2025 |

\* \* \* \* \*

**PROBABLE CAUSE / DETENTION HEARING**

BEFORE THE HONORABLE PETER BRAY
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
GLRtranscribers@aol.com
409-330-1610

```
 1   APPEARANCES:

 2   For the United States:

 3        MR. JIMMY LEO
          U.S. Attorney's Office
 4        Houston, TX 77002

 5   For the Defendants:

 6        MS. MOLLY P. BAGSHAW (For Defendant Ramirez Correa)

 7        MR. THOMAS S. BERG (For Defendant Pacheco)

 8        MR. JAVIER O. MARTINEZ (For Defendant Davila)

 9        MR. RAY VAZQUEZ (For Defendant Rodriguez Garcia)

10        MR. ANTHONY P. TROIANI (For Defendant Rojas)

11        MS. JULIE SODERLUND (For Defendant Delgado)

12        MR. MICHAEL DEGEURIN, JR. (For Defendant Berbin)

13        MR. MERVIN M. MOSBACKER (For Defendant Troconiz)

14        MR. KEVIN ACEVEDO-CARLSON (For Defendant Ternawsky)

15   U.S. Marshal Service:

16        HOUSTON DEPUTIES

17   Case Manager:

18        JASON MARCHAND

19   Electronic Recorder:

20        APRIL CAVAZOS

21   U.S. Pretrial Office:

22        SHELLY SCHMITT

23   Court Interpreter:

24        PABLO DONATI

25
```

1                         **WITNESS INDEX**

2   GOVERNMENT'S EVIDENCE:

3        FBI Agent ██████████  ████████

4             Direct Examination by Mr. Leo...........   8

5             Cross-Examination by Ms. Bagshaw........  40

6             Cross-Examination by Mr. Berg...........  47

7             Cross-Examination by Mr. Martinez.......  53

8             Cross-Examination by Mr. Vasquez........  62

9             Cross-Examination by Mr. Troiani........  64

10             Cross-Examination by Ms. Soderlund......  65

11             Cross-Examination by Mr. DeGeurin.......  72

12             Cross-Examination by Mr. Mosbacker......  82

13             Cross-Examination by Mr. Acevedo........  88

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2                10:36 A.M. - JULY 7, 2025

 3            THE COURT:  All right.  Good morning.  This is

 4   United States vs. -- and I'm going to call the name.

 5   If the defendant could just look at me and raise your

 6   hand and then lawyer announce your appearance.

 7                    Raul Armando Ramirez Correa.

 8            MS. BAGSHAW:  Molly Bagshaw for Mr. Ramirez

 9   Correa.

10            THE COURT:  Cesar Oskeiber Cabezas Pacheco.

11            MR. BERG:  Tom Berg for Mr. Pacheco.

12            THE COURT:  Peter Davila.

13            MR. MARTINEZ:  Javier Martinez for Peter

14   Davila.

15            THE COURT:  Otis Jose Rodriguez Garcia.

16            MR. VAZQUEZ:  Ray Vazquez on behalf of

17   Mr. Rodriguez Garcia, Judge.

18            THE COURT:  Dany Rojas.

19            MR. TROIANI:  Anthony Troiani on behalf of

20   Dany Rojas.

21            THE COURT:  Pedro Hernandez Delgado.

22            MS. SODERLUND:  Julie Soderlund on behalf of

23   Mr. Delgado.

24            THE COURT:  Ismael Leon Berbin.

25            MR. DEGEURIN:  Michael DeGeurin for Mr.
```

1   Berbin.

2           THE COURT:  Jesus Fernandez Troconiz.

3           MR. MOSBACKER:  Mervyn Mosbacker for

4   Mr. Fernandez Troconiz.

5           THE COURT:  And Embeer Gutierrez Ternawsky.

6           MR. ACEVEDO:  Attorney Kevin Acevedo on behalf

7   of Mr. Ternawsky.

8           THE COURT:  All right.  We're here this

9   morning on Preliminary Hearing, which is otherwise

10  known as a Probable Cause Hearing and a Detention

11  Hearing.

12          Do all the lawyers and the prosecutor have

13  the Pretrial Services Report?  If you don't, make that

14  known to me now.

15          MR. VAZQUEZ:  I don't have mine yet.

16          THE COURT:  Why don't you have it?

17          MR. VAZQUEZ:  I never got --

18          THE COURT:  You didn't ask for it?

19          MR. VAZQUEZ:  I don't think so.

20          THE COURT:  Yes, sir?

21          MR. MOSBACKER:  I'm missing one.

22          THE COURT:  What are you missing?

23          MR. MOSBACKER:  Jesus Fernandez Troconiz.

24          THE COURT:  I have it, so you should have it.

25          MR. LEO:  I'll print it out.

 1            THE COURT:  Okay, that's all right, but I

 2    mean, I have mine, so you should have yours.  It's just

 3    a matter of printing it out.  So we'll get it for you.

 4            Does -- Mr. Mosbacker, do you have your

 5    report?

 6            MR. MOSBACKER:  No, Your Honor.

 7            THE COURT:  Okay.  So that's -- all right.

 8    We'll get you reports very shortly.

 9            MR. MOSBACKER:  Thank you, Your Honor.

10            THE COURT:  To all the defendants and anybody

11    else who's in the courtroom, I just wanted to let you

12    know that this is not a trial, this is not a chance for

13    you to raise every defense and every fact that may

14    otherwise come out during the trial of your case is a

15    probable cause hearing which means I need to make a

16    determination that there are at least some facts in

17    existence from which I could conclude you committed

18    this crime.  And then we need to decide whether there

19    are any conditions I can set that would assure your

20    appearance and the safety of the community.

21            I would ask the Government to do your best

22    on the basic facts of the case in 15 minutes or so.  I

23    have the Pretrial Services Reports, and everybody now

24    has the Pretrial Services Reports.  We do not need to

25    prove these things up, although, at some point during

1  your presentation, I just need to know what's the final

2  verdict on what is their status in the country.  I'm

3  not sure how that changes things, but I would just --

4  some of it is just unknown of the writing of the

5  report.

6             Then to each of the defendants, we're

7  going to go in the order that you're sitting.  I'm

8  pretty sure that each of you, as we go down the line,

9  is going to have less to do because a lot of the facts

10 and the cross examination and the issues are going to

11 already -- there's nine of you.  So, if the first five

12 of you don't already bring something up, fine, then the

13 last four of you can.  But I'm asking you to please be,

14 you know, kind with each other's time and with my time.

15 If an issue has already been brought out, I heard it.

16 I'm paying close attention.  You don't need to redo it.

17 So none of the defendants should expect that your

18 lawyers are going to ask questions that have already

19 been asked.  That's not what we're doing here.

20             So, with those preliminary statements,

21 Mr. Leo, call your first witness and have him come up

22 and be sworn.

23         MR. LEO:  The Government calls ██████████

24 ███████.

25         *[Pause]*

1          CASE MANAGER:  Raise your right hand, sir.

2              Do you solemnly swear the testimony you

3  will give in the case now before the Court is the

4  truth, the whole truth, and nothing but the truth, so

5  help you God?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Go ahead.

8  **AGENT ███████ ███████, CALLED BY THE GOVERNMENT**

9                **DIRECT EXAMINATION**

10 **BY MR. LEO:**

11 Q.  Would you please state your full name for the

12 record?

13 A.  ███████ ███████.

14 Q.  How are you currently employed?

15 A.  As a special agent for the Federal Bureau of

16 Investigation.

17 Q.  Agent ███████, are you familiar with the criminal

18 complaint against Raul Correa, Cesar Cabezas Pacheco,

19 Peter Davila, Otis Rodriguez Garcia, Dany Rojas, Pedro

20 Delgado, Ismael Berbin, Jesus Troconiz, and Embeer

21 Gutierrez Ternawsky?

22 A.  Yes, sir.

23 Q.  And do you see all the defendants here in the

24 courtroom today?

25 A.  Yes, sir.

Agent ███████ - Direct by Mr. Leo                                          9

1  Q.   Okay, can you identify each one, please?

2  A.   Yes, sir.  So we have -- do you want me to go left

3  to right or right to --

4  Q.   Yeah, that's good.

5  A.   So we have Embeer Gutierrez Ternawsky.  I think

6  that's how you say the last name.  Jesus Fernandez,

7  Ismael Leon Berbin --

8              [Brief interruption]

9  BY MR. LEO:

10  Q.  The second gentleman, I'm sorry.

11  A.   The second gentleman, Jesus Fernandez, Ismael Leon

12  Berbin -- I believe that's how you say his name --

13  Pedro Hernandez Delgado, Dany Rojas, Otis Rodriguez,

14  Peter Davila, Cesar Pacheco, and Raul Ramirez Correa.

15              MR. LEO:  Your Honor, may the record reflect

16  that the witness has identified each of the nine

17  defendants in this case?

18              THE COURT:  All right, they're all identified.

19              MR. LEO:  Thank you, Judge.

20  BY MR. LEO:

21  Q.   Agent ██████, can you please tell the Court how

22  this case began?

23  A.   Yes, sir.  Through local source reporting and known

24  big TDA cases, Tren de Aragua, across the nation,

25  there's been --

1  Q.   Okay, wait, wait, wait.  Slow down.

2  A.   I'm sorry.

3  Q.   Articulate your words.

4  A.   Yes, sir.

5  Q.   It's very hard.  If I can't understand, then other

6  people can't understand, so --

7  A.   Yes, sir.

8  Q.   Thank you.

9  A.   Through local source reporting amongst the FBI and

10  across the country has learned about the gang, Tren de

11  Aragua, which was designated as a terrorist

12  organization by the Administration.  And also with TDA,

13  which is the abbreviation for Tren de Aragua -- which

14  I'll probably refer to it as TDA -- it became known via

15  source reporting of anti Tren de Aragua, which is

16  former TDA members that are now against TDA.  They were

17  formally TDA and now they've changed and do not get

18  along with the current TDA guys.

19          Through local source reporting, we learned

20  about these guys, knowing that they're known weapons

21  traffickers, do kidnappings, drugs.  We've done

22  multiple controlled gun buys for members of his

23  organization.  And through his multiple controlled gun

24  buys from multiple individuals, some that are sitting

25  right here, we learned that they also deal in cocaine

```
 1  and drugs of different sorts, to include cocaine and --
 2  I can't think of the name of the other drug.
 3          THE COURT:  You're saying that anti-Tren in
 4  general is an organization that you understand to sell
 5  drugs.  Is that what you're saying, in general?
 6          THE WITNESS:  Yes, sir.
 7          THE COURT:  Okay.
 8  BY MR. LEO:
 9  Q.  So, specifically, did you or a source begin to
10  communicate with Mr. Correa or Mr. Ternawsky in regards
11  to purchasing firearms?
12  A.  Yes.
13  Q.  And how did that come -- when did that start, and
14  how did that come about?
15  A.  It started around May, May 2nd, via text message
16  between Raul Correa and a source offered to sell us
17  firearms.  Coordinated that via text message and on
18  that same day, the firearm was sold.  Correa was not
19  there.  He directed his wife to bring down the weapon
20  to the source.
21  Q.  Okay, we'll talk about those weapons and Mr. Correa
22  in a minute.  Specifically, I want to get to the main
23  event that we have here.
24  A.  Okay.
25  Q.  So, I believe it was on May 27th, Mr. Ternawsky
```

1   texted the source.

2   A.   You said May 27th?

3   Q.   Yes, May 27, 2025.

4   A.   Yes.

5   Q.   Mr. Ternawsky texted the source requesting.  Do you

6   recall what he was requesting?

7   A.   Umm --

8   Q.   Or that he was -- if he was interested in

9   narcotics?

10  A.   Oh, yes.  Interested in cocaine, yes.

11          THE COURT:  Who was interested?  Ternawsky was

12  interested or asking if the source is interested?

13          THE WITNESS:  If the source was interested.

14          THE COURT:  Okay.

15  BY MR. LEO:

16  Q.   And did you -- did the source keep up these

17  conversations with Mr. Ternawsky?

18  A.   That's correct.

19  Q.   Okay, and specifically, what kind of messages occur

20  between Mr. Ternawsky and the source?

21  A.   They talked about the possibility of moving cocaine

22  from Houston to another location, via drug escort.

23  Q.   Okay.  At some point in time did the source also

24  meet with Mr. Correa to discuss moving narcotics?

25  A.   Yes, the source met with Correa and Ternawsky

1  multiple times --

2          THE COURT:  Wait, wait.  What's up?

3          MR. MOSBACKER:  Well, he didn't hear for a few

4  seconds.

5          THE COURT:  Okay, is it back?

6          MR. MOSBACKER:  Yes, Your Honor, he can hear.

7          THE COURT:  All right.  Ask the last question

8  again.

9  BY MR. LEO:

10 Q.   At some point did a source of information -- or

11 controlled source meet with Mr. Correa to discuss moving

12 narcotics?

13 A.   Yes.

14 Q.   Okay, when did that occur?

15 A.   The date -- off the top of my head --

16 Q.   Give me a month.

17 A.   Oh, in May in June, multiple times.

18 Q.   Okay.  And specifically, what did the source --

19 did the source try to enlist Mr. Correa's assistance?

20 A.   Yes.

21 Q.   Okay, in doing what?

22 A.   In transporting cocaine from here to Dallas and

23 Louisiana.

24 Q.   Okay.  And did Mr. Correa --

25          MR. DEGEURIN:  I'm sorry, Mr. Leo.  I'm sorry.

```
 1   His set is going intermittent.  I can hear it myself,
 2   but it goes in and out.
 3          THE COURT:  All right, is there another set?
 4          COURT INTERPRETER:  Your Honor, this is the
 5   only large set we have.  The others are for --
 6          MR. DEGEURIN:  It's working -- it works -- it's
 7   about every minute it cuts out.  But if it --
 8          THE COURT:  Can I just ask you something?
 9   Sometimes if you take the device out of his pocket,
10   make sure it's working, and then put it on the table
11   and stay still --
12          MR. DEGEURIN:  That's what -- I've tried to
13   get him not to touch the wire.
14          THE COURT:  Just -- sir, stay still, okay?
15   Everybody just will get through this, I promise.  Just
16   stay still.
17              Are you hearing now, Mr. Berbin?
18          DEFENDANT BERBIN:  Yes.
19          THE COURT:  All right.  Okay, go ahead.
20   BY MR. LEO:
21   Q.  Okay.  So what specifically did the controlled
22   source ask Mr. Correa to do for him?
23   A.  To transport 7 to 8 kilograms of cocaine to Dallas
24   and Louisiana.
25   Q.  Okay.  Did Mr. Correa discuss what kind of, I
```

1   guess, organization or manpower he had to accomplish

2   this request?

3   A.   Yes, he said he had multiple individuals that can

4   transport these drugs.

5   Q.   Okay.  Was there another meeting that occurred

6   between the source and Mr. Correa?

7   A.   Yes.

8   Q.   Okay.  Did that occur on June 22nd at a restaurant?

9   A.   Yes.

10            THE COURT:  Wait, wait.  Who -- when was this?

11            MR. LEO:  June 22nd.

12            THE COURT:  That's a meeting between who and

13   who?

14            MR. LEO:  Mr. Correa and the source.

15            THE COURT:  Okay, go.

16   BY MR. LEO:

17   Q.   Was there another individual present at that

18   meeting, along with Mr. Correa and the source?

19   A.   Yes.

20   Q.   And who was that?

21   A.   Embeer Gutierrez Ternawsky.

22   Q.   Mr. Ternawsky?

23   A.   Ternawsky, yes.

24   Q.   Okay.  And what was discussed specifically at that

25   meeting?

1  A.   Discussed about how many people they were going to

2  bring, vehicles, and what exactly did they need for the

3  source, for them to do?

4  Q.   Okay.  Did they say how much money they were going

5  to need to pay the individuals that were going to do

6  this?

7  A.   Yes, $10,000.

8  Q.   Okay.  And was it -- did they divvy it up per

9  individual?

10  A.   Well, the money was to be paid to Embeer Ternawsky

11  and Embeer would separate the money between the rest of

12  the crew.

13  Q.   Okay.  And did they ask for a thousand dollars per

14  member?

15  A.   Yes, yes.

16  Q.   And did they ask for $1500 for themselves, for

17  Mr. Ternawsky and Mr. Correa?

18  A.   Yes.

19  Q.   And this was an agreement to move how much cocaine?

20  A.   Well 7 to 8 kilograms of cocaine in two different

21  packages, so around 16.

22  Q.   Okay.  And I know there's some other things to

23  discuss.  I'll work my way back to that in a minute.

24        So was there -- on June 26th, was the CH, the

25  source, notified that the group was ready to do the

1  delivery?

2  A.   That's correct.

3  Q.   And who contacted the source directly?

4  A.   Mr. Ternawsky.

5  Q.   Okay.  And did they agree -- where did they agree

6  to meet?

7  A.   An IKEA located in Houston.

8  Q.   Okay.  And did -- have you -- did you learn at some

9  point, either at that time or shortly thereafter, how

10  it is that Mr. Ternawsky and Mr. Correa were advising

11  the members of their organization to meet at the same

12  place -- or where to meet?

13  A.   Yes, when Mr. Correa and Mr. Ternawsky were in a

14  group message with the source where they were

15  communicating, and at the location Mr. Ternawsky stated

16  that he was sharing locations with the group so they

17  would know where to meet at.

18  Q.   Okay.  And where did they -- they met at an IKEA,

19  and where is the IKEA located?

20  A.   It's located in Houston right off of I-10.  I can't

21  think of that exact address off the top of my head.

22  Q.   Okay.  It's the Katy Freeway, and it's in Houston,

23  Texas.

24  A.   Yes.

25  Q.   Which is in the Southern District of Texas.

1   A.   Yes.

2   Q.   And did they eventually agree to meet with the

3   source and their crew?

4   A.   Yes.

5   Q.   Okay.  Once they met at the IKEA, what happened at

6   the IKEA?

7   A.   When they met at the IKEA, they met up with two FBI

8   sources, and they were in their car as they arrived.

9   The source told them to follow them, and they were

10  going to follow to the location where the actual drugs

11  were located at.

12  Q.   Okay.  So, did they relocate to a different

13  location?

14  A.   That's correct.

15  Q.   And which --

16          THE COURT:  Can I just ask, at this point, is

17  everybody that's a defendant now, are they all present

18  on the first scene?

19          THE WITNESS:  No, sir.  No.

20          THE COURT:  Who was present?

21          THE WITNESS:  At the first scene is Ternawsky,

22  Correa, Davila, and --

23          THE COURT:  Whoa, whoa, whoa.  Slow down, slow

24  down.

25          So at the IKEA, who shows up?

```
 1            THE WITNESS:  Ternawsky --
 2            THE COURT:  All right, Ternawsky.  Hold on.
 3   Who else?
 4            THE WITNESS:  Otis Rodriguez.
 5            THE COURT:  Okay, hold on.  Otis -- what's his
 6   last name?
 7            THE WITNESS:  Rodriguez --
 8            THE COURT:  You've got them memorized.  I
 9   don't.
10            THE WITNESS:  I don't have them memorized.
11            THE COURT:  Rodriguez Garcia.
12               Okay, who else?
13            THE WITNESS:  Cesar Pacheco.
14            MR. LEO:  That's Cesar Oskeiber Cabezas
15   Pacheco, Judge.
16            THE COURT:  Okay.  Who else?
17            THE WITNESS:  And Peter Davila and Raul
18   Ramirez Correa.
19            THE COURT:  Okay.  So -- okay, go ahead.
20   BY MR. LEO:
21   Q.  Did -- when the source met with these individuals
22   at the IKEA, did he speak to all of them, or did he
23   just speak to Mr. Ternawsky?
24   A.  At the IKEA, I believe it was just Mr. Ternawsky.
25   Q.  Okay.  But you were able to identify these other
```

1  four individuals that were at the IKEA?

2  A.   Yes.  But when they got to the other location via

3  cameras.

4  Q.   Right, okay.  So you knew there were four

5  individuals at the IKEA, and you hadn't fully

6  identified them until later?

7  A.   Yes.

8  Q.   Okay.  So you relocate to what location?

9  A.   We relocated to a -- it's a storage facility.  I

10  can't think of the exact address.  It's right off of

11  610 and 290.  I can't think of the exact address off

12  the top of my head.

13  Q.   But it's in Houston?

14  A.   Yes, sir.

15  Q.   Okay.  And, so who pulls -- I guess how many

16  vehicles pull into this warehouse strip?

17  A.   Three vehicles pull in.

18  Q.   Initially.

19  A.   Yes, sir.

20  Q.   Okay.  Who's in the first vehicle?

21  A.   The first vehicle is going to be Mr. Ternawsky and

22  Rodriguez Garcia.

23  Q.   Okay.  And well, where were the two sources?

24  A.   They were in the car follow -- they were following

25  the source's vehicle.

1   Q.   Okay.  So the first vehicle is Ternawsky and

2   Rodriguez?

3   A.   Yes.

4   Q.   Who was in the second vehicle?

5   A.   The second vehicle would be Pacheco, Cesar Pacheco.

6   Q.   Okay, and he was by himself?

7   A.   Yes, sir.

8   Q.   Okay, and who was in the third vehicle?

9   A.   Raul Correa and Peter Davila.

10  Q.   Okay.  And was the -- the two sources of

11  information, were they behind these three vehicles?

12  A.   Well they were in front of the three vehicles.

13  They were following them.  And I'm sorry, the source

14  vehicle pulled in first and then the three vehicles

15  followed the source into the --

16  Q.   Okay.

17  A.   Yes, sir.  Sorry if that was confusing.

18  Q.   Shortly after the source vehicle and these three

19  vehicles that we discussed that were all --

20          THE COURT:  Quick question.  What time of day

21  are we talking about right now?

22          THE WITNESS:  This is 9 p.m. at night.

23          THE COURT:  And this storage facility, is this

24  a place open to the public?

25          THE WITNESS:  So it's always open during the

1   day.  At night, it's an isolated facility, one way in,

2   one way out.  There were no other vehicles or people in

3   there other than the SWAT team members that were inside

4   the location.

5           THE COURT:  All right, so the gate was closed

6   at the time.

7           THE WITNESS:  There was no gate, so when I say

8   storage facility, when you drive into it, there's a lot

9   of garages, but there's no exact gate to actually drive

10  in.

11          THE COURT:  Is there an office?

12          THE WITNESS:  I believe at the front of the

13  complex, but nobody would have been in there.

14          THE COURT:  It was closed at the time?

15          THE WITNESS:  Yes, HPD SWAT team was utilizing

16  the front as their staging location.

17          THE COURT:  Okay, but it would have been closed

18  at the time?

19          THE WITNESS:  Yes.  Yes, sir.

20          THE COURT:  Okay.

21  BY MR. LEO:

22  Q.  After the vehicle with the sources and these three

23  vehicles that we just discussed entered, did any other

24  vehicles arrive at the location?

25  A.  Yes, three more vehicles arrived.

1  Q.   Okay.  And how quickly did they arrive?

2  A.   Within minutes.  It was very quick.

3  Q.   Do you -- and if you know, do you know if those

4  three vehicles were at the IKEA?

5  A.   To my knowledge, I do not remember if they were at

6  the local -- did not see them at the IKEA.

7  Q.   Okay, so who was in the first vehicle?

8  A.   Of the next three that showed up?

9  Q.   Yes.

10         THE COURT:  So why don't we number them.  So

11  we're talk -- vehicle four?

12         MR. LEO:  Vehicle number four.

13         THE WITNESS:  Vehicle number four would have

14  been Pedro Hernandez Delgado.

15  BY MR. LEO:

16  Q.   And he was by himself?

17  A.   Yes.

18  Q.   And who was in the fifth vehicle or vehicle five?

19  A.   Dany Rojas.

20  Q.   And he was by himself?

21  A.   Yes.

22  Q.   And then who was in the sixth vehicle?

23  A.   Jesus Fernandez and Ismael Leon Berbin.

24         THE COURT:  You're saying that -- is this the

25  one that's spelled B-E-R-B-I-N?

Agent ███████ ██████ - Direct by Mr. Leo                           24

```
 1              THE WITNESS:  It's B-E-R-B-I-N, I believe.  So
 2   we got two different names wrong.  One is B-E-L-B-I-N,
 3   Belbin.  The other one is like B-E-R-V-I-N.
 4              THE COURT:  Okay.  All right.  It's just the
 5   pronunciation of the B.
 6              MR. DEGEURIN:  Judge, if I may --
 7              THE COURT:  It doesn't matter right now.  I
 8   just want to make sure I'm talking about the right
 9   person.  You can clarify it later, okay?
10                 So who was in vehicle six again?
11              THE WITNESS:  Jesus Fernandez and Ismael Leon
12   Berbin.
13              THE COURT:  Okay.  Go ahead.
14   BY MR. LEO:
15   Q.  The initial vehicles that pull in, they pull in
16   closer to the source vehicle?
17   A.  That's correct.
18   Q.  Okay.  These --
19   A.  Well, except for Pacheco.  Pacheco tentatively
20   parked across from the -- so not directly next to him,
21   but across and then walked over, yes.
22   Q.  Okay.  These other three vehicles that came in at
23   the end, where did they park and how did they park?
24              THE COURT:  And by the way -- hold on, hold on.
25   When you're saying Jesus Fernandez, you mean Troconiz?
```

```
 1              THE WITNESS:  Troconiz --
 2              THE COURT:  Was in the -- he's in the
 3  vehicle 6?
 4              MR. LEO:  Yes.
 5              THE WITNESS:  Yes.
 6              THE COURT:  Okay.  The one represented by
 7  Mr. Mosbacker over there?
 8              THE WITNESS:  Yes.
 9              THE COURT:  Okay.  So we've got to be
10  consistent with the last names here.  It's killing me.
11  It's like there's different people.  So that one's
12  Troconiz.
13              THE WITNESS:  Yes, I'm sorry.  Troconiz.
14              THE COURT:  So, by this time, once all six
15  vehicles plus the source vehicle arrived, every
16  defendant that's in this room is on the scene; right?
17              THE WITNESS:  That's correct.
18              THE COURT:  Okay.
19  BY MR. LEO:
20  Q.  Vehicles 4, 5, and 6 -- when they entered, how did
21  they park and where did they park?
22  A.  They all backed in to a park -- well not a parking
23  spot but just backed in along the wall next to the rest
24  of the vehicles that were parked there.
25  Q.  Did any of them get out of their vehicles at this
```

1   time?

2   A.   As far as the three new vehicles that showed up?

3   Q.   Vehicles 4, 5, and 6, yes.

4   A.   No.

5   Q.   Okay.  Once the sources part, did they meet with

6   anybody, did they get out of their vehicles and meet

7   with anybody?

8   A.   Yes, the two sources met with five individuals.

9   Q.   Okay, the sources met with which individuals?

10  A.   Mr. Ternawsky, Mr. Davila, Mr. Pacheco,

11  Mr. Rodriguez --

12          THE COURT:  Wait, wait, wait.  Pacheco,

13  Rodriguez --

14          THE WITNESS:  Yes, and Correa.

15          THE COURT:  All right.

16  BY MR. LEO:

17  Q.   So the same individuals that were at the IKEA, the

18  sources meet with them.

19  A.   That's correct.

20  Q.   Okay.

21          THE COURT:  These are the guys in vehicles 1,

22  2, and 3.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Okay.

25  BY MR. LEO:

1   Q.   And what conversations if any take place between

2   the controlled sources and these five individuals?

3   A.   The two sources explained to them that they were

4   going to be transporting 7 to 8 kilograms of cocaine to

5   two locations, one in Dallas and one to Louisiana.  And

6   then the source proceeded to pay the 10k in cash to

7   Mr. Ternawsky.

8   Q.   Okay.  So all these -- these five individuals all

9   heard and understood what the job was?

10  A.   That's correct.

11  Q.   After they had these discussions, were any items

12  given to any of these five individuals?

13  A.   Yes.  So there were two pelican cases, probably the

14  size of two shoe boxes put together.  Embeer Ternawsky

15  was given one of the suitcases that he then placed in

16  his vehicle.  And Raul Ramirez Correa received the

17  other package that he walked and placed into Pedro

18  Hernandez Delgado's vehicle.

19  Q.   So one of the suitcases was placed in vehicle

20  number 4, which was Pedro Hernandez Delgado.

21  A.   That's correct.

22          THE COURT:  And then what happened?  What was

23  the other one?

24          THE WITNESS:  The other vehicle was in --

25          THE COURT:  The other pelican case.

1              THE WITNESS:  It was in vehicle number 1.

2              THE COURT:  No, no.  Who -- it was handed to

3    who?

4              THE WITNESS:  Oh, it was handed to Embeer

5    Ternawsky for the first one.  The second one was handed

6    to Raul Ramirez Correa.

7              THE COURT:  And what does he do with it?

8              THE WITNESS:  He takes that pelican case and

9    walks to vehicle number 4 and places it inside the

10   vehicle --

11             THE COURT:  Also vehicle 4.  So both go into

12   vehicle 4?

13             THE WITNESS:  I'm sorry, vehicle 1 and

14   vehicle 4.

15             THE COURT:  You're killing me.  Ternawsky gets

16   a pelican case.

17             THE WITNESS:  Yes, and places it in his

18   vehicle, vehicle number 1.

19             THE COURT:  In his own vehicle.  That's not

20   what you said.

21             THE WITNESS:  Okay, my apologies.

22             THE COURT:  Okay.  Vehicle 1, all right, which

23   is what he showed up in.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Another pelican case is given to

1  Ramirez Correa, and he does what with that?

2          THE WITNESS:  And walks it to vehicle 4 and

3  places it inside of vehicle 4.

4          THE COURT:  And inside of vehicle 4 is

5  Hernandez Delgado?

6          THE WITNESS:  That's correct.

7          THE COURT:  Keep going.

8  BY MR. LEO:

9  Q.  After the sources have this conversation, did they

10 disperse at some point?

11 A.  Yes, you see them disperse, and they're talking

12 amongst each other.  You see Peter Davila walk up in

13 the area of vehicles 4, 5, and 6 and speak to

14 individuals that are inside the vehicle.

15 Q.  Okay.  So Peter Davila, after they've had the

16 meeting of what they're moving and the suitcases have

17 been dispersed, Peter Davila approaches vehicles 4, 5,

18 and 6.

19 A.  Yes, sir.

20 Q.  Now can you see who he's speaking to directly, or

21 do you just know he was speaking to individuals?

22 A.  I can't see who he was speaking to directly.  I

23 just know he was speaking to people inside the vehicle.

24 Q.  Okay.  Did he --

25          THE COURT:  How is it that he -- so he's got

1    these three vehicles and they're all backed in to

2    spots.  When you say he's speaking to people in 4, 5,

3    and 6, is he going from vehicle to vehicle, or is he

4    like barking out things that he's saying, in general,

5    to open windows?  How does that work?

6              THE WITNESS:  So he originally went to vehicle

7    number 4, was there for a short amount of time, and

8    then went in between vehicles 5 and 6, and you could

9    see him looking in vehicle 6 first and then looking

10   over into vehicle 5.

11             THE COURT:  Okay, thank you.

12             MR. LEO:  That was going to be my next

13   question.

14             THE COURT:  All right.  Sorry.  I'm just

15   trying to under -- I'm trying to picture it all.

16             MR. LEO:  I understand, Judge.

17   BY MR. LEO:

18   Q.  At this point, what -- then what happens at this

19   point?

20   A.  At this point, you see some individuals get out of

21   the vehicles, you see Dany Rojas get out of the

22   vehicle, Ismael Leon Berbin get out of the vehicle,

23   and they're just standing around there talking for a

24   second.  The two sources then walk away towards one of

25   the storage units, and at this point, that's when the

1  HPD SWAT team came in lights and sirens and arrested

2  all the individuals that were on the scene.

3  Q.   Okay.  When the lights and sirens came, do you know

4  where Pedro Delgado, Dany Rojas, and Ismael Berbin, and

5  Peter Davila, where were they located when the lights

6  and sirens -- when the SWAT team moved in?

7  A.   Well, Pedro Delgado was the only one still sitting

8  in his car of those named.  The rest of them were kind

9  of standing outside around.  When the lights and sirens

10 came on, the other three individuals started running,

11 and you can see Mr. Hernandez Delgado exit the vehicle

12 from the passenger's side away from where the majority

13 of the police were at and get out and run north until

14 they see other members of the HPD SWAT team.

15 Q.   Okay --

16           THE COURT:  Just a minute.  So who -- so

17 Delgado gets out and runs away.

18           THE WITNESS:  Yes.

19           THE COURT:  Who else fled?

20           THE WITNESS:  Dany Rojas, Peter Davila, and --

21           THE COURT:  Berbin?

22           THE WITNESS:  Berbin.  Yes, sir.  Yes, sir.

23           THE COURT:  Okay, go ahead.

24 BY MR. LEO:

25 Q.   And then when you say run, did they get very far?

Agent ██████████ - Direct by Mr. Leo                                    32

1    A.   They did not get very far.

2    Q.   Okay.  Was it more of like an attempt to run?

3    A.   Yes, it was an attempt to run, and then you can

4    tell they noticed where HPD came out from the farther

5    end, and that's when they stopped running and turned

6    around and started coming back.

7    Q.   Okay.  And all the individuals were taken into

8    custody?

9    A.   Yes, sir.

10   Q.   Okay.  Now several of these individuals provided

11   post-arrest statements?

12          THE COURT:  All right, before you get to that,

13   did the source report to you what he said when he spoke

14   to the people inside of vehicles 4, 5, and 6?

15          THE WITNESS:  So the source never directly

16   spoke to the people inside of vehicles 4, 5, and 6.

17          THE COURT:  I thought you said he went to --

18          THE WITNESS:  Peter Davila.

19          THE COURT:  Davila did.  Okay, I'm sorry.  I

20   missed that.

21              All right.  I got it now.  Go ahead.

22   BY MR. LEO:

23   Q.   Several of these individuals provided post arrest

24   statements?

25   A.   Yes.

1    Q.    They were Mirandized?

2    A.    Yes.

3    Q.    And they agreed to provide statements?

4    A.    Yes.

5    Q.    Let's start with Pedro Hernandez Delgado.  What

6    statements, if any, did he provide?

7    A.    That he was there to transport a vehicle for

8    $1,000.  And he also lied to us about his name on the

9    scene.

10   Q.    What name did he give?

11   A.    Luis Solano.

12   Q.    Okay.  And -- what about -- next I want to talk

13   about -- sorry -- Jesus Fernandez Troconiz.  Okay.

14   And I believe you said he was in vehicle number 6.

15   A.    Yes.

16   Q.    Okay.  What did he tell law enforcement that he was

17   there to do?

18   A.    He said that he was there to transport people to

19   Dallas.

20   Q.    Okay.  And --

21   A.    And I believe he said he was going to get paid

22   $500, or I can't remember that dollar amount.

23   Q.    And Ismael Leon Berbin, what statements -- and he

24   was -- Berbin was with Mr. Fernandez in vehicle

25   number 6.

1  A.   That's correct.

2  Q.   And what did he say he was there to do?

3  A.   He said he was there to do a job and make money.

4  Q.   Okay.  And Mr. Rojas did not provide a statement.

5  A.   That's correct.

6  Q.   Okay, however, did FBI or one of the agencies

7  involved, did they do anything, I guess, remarkable

8  with the money prior to giving it to these individuals?

9  A.   Yes, so before we arrived on scene, with the money

10 and then giving it to the source, the FBI placed

11 chemical tagging agent on the money.  So, therefore,

12 when you pass out the money, if you put a UV light to

13 someone's hands, you would be able to see who all was

14 touching the money that had that chemical tagging agent

15 on it.

16 Q.   And did you use that UV light to inspect the hands

17 of these nine individuals?

18 A.   Yes.

19 Q.   And what was the result of -- when you shone the

20 light on Dany Rojas' hands, what was the result?

21 A.   It showed -- the black light indicated that he

22 touched the money.

23 Q.   Okay.  Was there anyone else that also -- their

24 hands reflected that they had touched the money

25 according --

1  A.   Yeah, that's correct.

2  Q.   Who else?

3  A.   Embeer Ternawsky, Correa -- or Ramirez Correa.  I'm

4  trying to remember all of them off the top of my head.

5  Davila, I believe.  Give me a second.  I'm trying to

6  just remember which all that touched the money.  Dany

7  Rojas, we just said that one.

8  Q.   I think that's it.

9  A.   Yes, sir.

10 Q.   Okay.  Let's talk a little bit about the weapons

11 trafficking that the source had engaged in with

12 Mr. Ramirez Correa.

13 A.   Yes.

14 Q.   Okay.  And I believe that he's charged in a

15 separate complaint; is that correct?

16 A.   Yes.

17 Q.   Okay, and what is he being charged with?

18 A.   Selling a firearm without a license, I believe.

19 Q.   Is it being in the business of selling firearms?

20 A.   Yes.

21 Q.   Okay.  And did -- at some point, was there a series

22 of purchases that were made for Mr. Correa?

23 A.   Yes.

24 Q.   And when did that first -- do you recall when that

25 first purchase occurred?

1  A.   I believe it was May 2nd.

2  Q.   Okay.  And was that for a Canik T9 firearm?

3  A.   Yes.

4  Q.   And who did he sell it to and for how much?

5  A.   He sold it to an FBI source.  The price -- I can't

6  remember the exact price off the top of my head.  It

7  may have been a thousand dollars or in that realm.

8  Q.   Okay.  And in that particular purchase, who

9  actually delivered the firearm to the source?

10  A.   Mr. Ramirez Correa's wife, Ashley Fuentes.

11  Q.   Okay.  And this -- what were the communications

12  taken -- was this a phone call or were these text

13  messages or WhatsApp?

14  A.   Yes, so the source communicated via text message

15  with Mr. Ramirez Correa earlier in the day.

16  Q.   And was there a second firearm that was purchased

17  two days later on May 4th?

18  A.   Yes.

19  Q.   And was that a Smith & Wesson M&P?

20  A.   Yes, sir.

21  Q.   Okay, and how much was that sold for?

22  A.   I believe a thousand dollars as well.

23  Q.   All right.  And who delivered -- did Mr. Correa

24  deliver that firearm?

25  A.   Yes, sir.

1  Q.   Are you sure?

2  A.   Ummm --

3  Q.   Or was it -- he didn't send somebody by the name of

4  Ramirez Delgado?

5  A.   I can't remember off the top of my head which

6  person it was.

7  Q.   And was there -- did ATF look into Mr. Ramirez

8  Correa as to whether he was a responsible person or

9  owner of any ATF license or **(?)** to sell or buy

10 firearms?

11 A.   Yes, they looked into him.

12 Q.   And did he have that?

13 A.   No.

14 Q.   And did Mr. Correa, on June 8th, did he sell

15 another firearm to the source?

16 A.   Yes, sir.

17 Q.   And that was a Glock 45?

18 A.   Yes, sir.

19 Q.   And on that particular one, was Mr. Correa

20 deliver -- did he deliver that one to the source?

21 A.   Yes, sir.

22 Q.   And on June 22nd, did the source -- the source met

23 with Mr. Correa and Mr. Ternawsky?

24 A.   Yes.

25 Q.   Okay.  I know they were talking about the drugs,

1  but what else did they discuss at that meeting?

2  A.   They discussed the drugs.  They also discussed the

3  potential of selling us a grenade and an AT4, which is

4  a military-grade weapon.  They also stated that they

5  would have to kidnap people in order to get some of

6  these weapons.  But, yeah, they talked about those and

7  that there are four AT4s in Houston, that they have

8  access to them and just to give them the money.  They

9  also showed the source a WhatsApp chat that has

10 multiple members of the group in it that shows multiple

11 different weapons.  And it's kind of on a first come,

12 first serve basis.  So that's why most of these deals

13 happen like within 24 hours.

14 Q.   And the individuals present at that meeting was

15 Mr. Correa and Mr. Ternawsky?

16 A.   Yes, sir.

17 Q.   Okay.  And an AT4 is a grenade launcher?

18 A.   It's a rocket launcher, yes, sir.

19 Q.   Okay.  And they stated that in order to secure

20 certain firearms like an AT4, they may have to kidnap

21 someone to get it?

22 A.   That's correct.

23 Q.   And at the end of the conversation, did the

24 source --

25          THE COURT:  If Mr. Ternawsky could stop

1  gesticulating, I'd appreciate it.

2              Go ahead.

3  BY MR. LEO:

4  Q.   Did the source understand how many firearms that

5  Mr. Correa had sold?

6  A.   Yes, I believe he told the source -- Mr. Ramirez

7  Correa told the source he had sold 38 firearms, 37 or

8  38 firearms.

9  Q.   And that was in what, the last month?  Did he say?

10 A.   I believe it was in the last couple of months.  I

11 can't say the exact frame of time.

12 Q.   Okay.

13             THE COURT:  So firearms like this go in the

14 what, several hundred to low thousands?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Basically?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  So, if he sold 30 firearms in the

19 last few months, it might be 10 in a month?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Times a few hundred dollars or so?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Okay.  Thank you.

24 BY MR. LEO:

25 Q.   And did Mr. Correa actually present himself as

Agent ▮▮▮▮▮▮▮▮ - Cross by Ms. Bagshaw                                    40

1   somewhat of a firearms dealer to the source?

2   A.   Yes.

3   Q.   Okay.

4            THE COURT:  How did he do that?

5            THE WITNESS:  I'm just saying that he had

6   access to whatever firearms that we needed, that the

7   source needed.

8            *[Pause]*

9            MR. LEO:  Sorry, Judge, I'm just taking a

10  moment to look at my notes.

11           THE COURT:  That's all right.

12           MR. LEO:  Okay, that's it.  I'll pass the

13  witness, Your Honor.

14           THE COURT:  All right.  Ms. Bagshaw, cross?

15           MS. BAGSHAW:  Yes, Your Honor.  Where do you

16  want us to --

17           THE COURT:  Wherever you want to be.

18           MS. BAGSHAW:  Okay.

19                    **CROSS-EXAMINATION**

20  **BY MS. BAGSHAW:**

21  Q.   Sorry, Agent ▮▮▮▮▮.  I feel like I'm very close

22  to you.

23  A.   Oh, you're fine.  You're fine.

24  Q.   Just some background questions --

25           THE COURT:  If you want to use the podium, you

```
 1  can do that, too.  I mean --
 2          MS. BAGSHAW:  That's okay.  I am comfortable
 3  here.
 4          THE COURT:  Okay.
 5          MS. BAGSHAW:  Thank you.
 6  BY MS. BAGSHAW:
 7  Q.  Just a few background questions about Tren de
 8  Aragua.
 9  A.  Uh-huh.
10  Q.  You mentioned that it's your belief that these
11  defendants here are part of anti-Tren de Aragua, that
12  they had been part of it before?
13  A.  That's either a member of anti-TDA or associate.
14  Q.  How would you distinguish between a member and an
15  associate?
16  A.  Well, as far as distinguishing between a member and
17  an associate, like some of them identified and admitted
18  to being a member of anti-TDA, and others just friends.
19  They're not necessarily documented in Houston, correct,
20  because it's a newer gang to Houston.  So that's how I
21  would differentiate them, just based off kind of what
22  they tell us and not necessarily being documented yet.
23  Q.  And you mentioned something about kidnappings in
24  part of the regular course of dealings.  Did that apply
25  to Tren de Aragua and anti-TDA?
```

1  A.  Yes, ma'am.

2  Q.  Moving to the arrest of everybody here, including

3  Mr. Correa, when the money was exchanged, no drugs were

4  ever recovered as part of that transaction?

5  A.  Like drugs like the --

6          THE COURT:  There were no drugs; right?

7          THE WITNESS:  There were no drugs.  There were

8  no drugs, no.

9          THE COURT:  It was a dry conspiracy --

10          THE WITNESS:  Yes.

11          THE COURT:  -- is what we call that.

12          MS. BAGSHAW:  Understood.  And --

13          THE COURT:  But the amount of drugs

14  contemplated was --

15          THE WITNESS:  Yes, so there were, in the two --

16          THE COURT:  Was what amount?  What was the

17  amount?

18          THE WITNESS:  7 to 8 kilograms of cocaine.

19  BY MS. BAGSHAW:

20  Q.  But there were none recovered after a search of all

21  the vehicles?

22  A.  Well, so we hadn't searched the vehicles yet, but

23  you can see in plain view in the red vehicle that

24  Mr. Hernandez Delgado was driving that Mr. Correa

25  placed the pelican case into, you could see it in plain

1    view inside the vehicle.

2    Q.   You could see what in plain view?

3    A.   The pelican case that we gave him.

4    Q.   Understood.  But there were --

5              THE COURT:  There were no drugs.

6              THE WITNESS:  There were no drugs, no.

7              THE COURT:  There were no drugs.

8              MS. BAGSHAW:  And --

9              THE COURT:  It was an agreement, and a

10   conspiracy under the drug laws simply requires an

11   agreement.  That's all it requires.  There were no

12   drugs.

13   BY MS. BAGSHAW:

14   Q.   You mentioned there were a few people who tried to

15   run, but didn't get very far.  Mr. Correa was not part

16   of that group?

17   A.   That's correct.

18   Q.   And talking about the firearms issue, there were

19   communication via text message, you said?

20   A.   You said the firearms, as far as --

21   Q.   Yes, with Mr. Correa, what Mr. Leo talked about at

22   the end.

23   A.   Yes, and the sources, yes.

24   Q.   Okay.  And there -- what was the phone number

25   associated with these text messages?

1   A.   I can't say the phone number off the top of my

2   head, what the phone number is.

3   Q.   And there wasn't a name associated with it, either?

4   A.   To the best of my -- I cannot remember to the best

5   of my knowledge what number -- what name came from his

6   number.

7   Q.   So all the coordinating for the purchase and sales

8   of these firearms happened via text message?

9   A.   Yes.

10  Q.   And there were two different transactions that are

11  being attributed to Mr. Correa, but he wasn't the

12  person who actually brought the firearm to the

13  transaction; is that right?

14  A.   That's correct.

15  Q.   But the third one, he was?

16  A.   Yes.

17  Q.   And let's talk a little bit about that conversation

18  between a source with Mr. Correa and Mr. Ternawsky.  You

19  mentioned that that was in person?

20  A.   Yes.

21  Q.   At a restaurant or where was that?

22  A.   It was at a restaurant.

23  Q.   And that was where you mentioned that supposedly

24  they said that they would have to kidnap people to make

25  these firearms transactions work?

1   A.   So they mentioned -- they had mentioned that.  I

2   don't  believe that one specifically was at the

3   restaurant.  There was another meeting where we bought

4   a **(?)** off of Mr. Ternawsky that also had a machine gun

5   conversion device in it.  I believe that was the night

6   or the week before -- there were a couple of different

7   meetings between them that they talked to us.  So, as

8   far as telling exactly which day, I can't remember

9   which day it was, but they definitely had the

10  conversation as far as kidnapping individuals to get

11  these certain type of weapons.

12  Q.   And when you say they had the conversation --

13  A.   Is Correa, Ternawsky, and the source.

14  Q.   But you can't tell us which one of them actually

15  said that?

16  A.   I'm trying to think off the top of my head.  I

17  don't remember which one said that.  I know they were

18  both present at that conversation, having that

19  conversation with the source.

20  Q.   They were both present, but you don't know which

21  one of them said the statement about having kidnapped

22  people?

23  A.   I don't want to lie to you, so I'm just trying to

24  say I don't remember which one said it of the top --

25              THE COURT:  You know what?  I'm not going to

```
 1   do anything with the whole kidnapping conversation.  I
 2   don't know who's kidnapping who or if people are just
 3   talking and saying things that people say.
 4          MS. BAGSHAW:  I'm almost done, Judge.
 5          THE COURT:  I'm not rushing you.  I'm just
 6   letting you know we could go all day on the kidnapping
 7   thing, and I'm tuning the kidnapping part out.  Just
 8   letting you know.
 9          MS. BAGSHAW:  Good to know.
10   BY MS. BAGSHAW:
11   Q.  Moving on to the statement that was supposedly made
12   about selling 38 firearms.  Was there documentation
13   about those 38, or that's just the statement that was
14   made?
15   A.  I believe that one was recorded.  All the buys were
16   recorded.
17   Q.  But the account of "I've sold 38 firearms" is just
18   a statement, there is not anything --
19   A.  As far as -- oh, that's correct.
20          MS. BAGSHAW:  I'll pass the witness for now,
21   Your Honor.
22          THE COURT:  All right, Mr. Berg?  Do you want
23   to use the podium?
24          MR. BERG:  Yeah, I think so.
25          THE COURT:  All right.
```

1                          **CROSS-EXAMINATION**

2    **BY MR. BERG:**

3    Q.    Agent ██████, all these conversations were in

4    Spanish; right?

5    A.    Yes, sir.

6    Q.    Do you speak Spanish?

7    A.    I do not speak Spanish.

8    Q.    So you don't know what anybody said?

9    A.    I know what the linguist told me they said.

10   Q.    Okay, you're relying on the linguist.

11           Let's talk about Mr. Pacheco, because you

12   haven't said too much about him, have you?

13   A.    I have.

14   Q.    Mr. Pacheco was not involved in any firearms

15   transactions, was he?

16   A.    That's correct.

17   Q.    To your knowledge?

18   A.    To my knowledge, yes, that's correct.

19   Q.    And he arrived alone in a vehicle.

20   A.    That's correct.

21   Q.    And followed the group from IKEA to the warehouse?

22   A.    That's correct.

23   Q.    When he got to the warehouses, did he get out of

24   his car?

25   A.    Yes, he did.

1  Q.   And where did he go?

2  A.   He walked to the group with the sources where they

3  explained that they were transporting 7 to 8 kilograms

4  of cocaine.

5  Q.   Okay.  But again, this was in Spanish?

6  A.   Yes, one of the sources speaks English and the

7  other source speaks Spanish.  There were two sources

8  that were there.

9  Q.   Were they explaining in English as well as Spanish?

10  A.   They were explaining in Spanish.

11  Q.   Okay, so it was all in Spanish?

12  A.   Yes.  So source number 1, well the source that was

13  there, would say it English.  The second source would

14  then relay the information in Spanish, hear what they

15  said back and then relay it back to the other source.

16  Q.   And were these conversations by the sources

17  recorded?

18  A.   Yes, they were.

19  Q.   Okay.  Did Mr. Pacheco respond to any of this

20  conversation?

21  A.   As far as he respond -- the majority of the

22  conversation was held by Mr. Ternawsky and Correa.

23  Q.   Okay, so Mr. Pacheco didn't say anything.

24  A.   I can't say he didn't say anything.  I can just

25  say --

Agent ████████████ - Cross by Mr. Berg                                          49

```
 1            THE COURT:  All right, you don't know what he
 2   said?
 3            THE WITNESS:  Yes, sir.
 4            THE COURT:  Okay.
 5   BY MR. BERG:
 6   Q.   Or if he said anything.  You don't know?
 7   A.   I don't know.
 8   Q.   And from there, he went back to his car?
 9   A.   No, he stood outside.
10   Q.   He stood outside.  When the bus went down, he did
11   not try to run.
12   A.   That's correct.
13   Q.   Okay.  Now you say you've not conducted a search of
14   these vehicles yet.  Is that correct?
15   A.   That's correct.
16   Q.   Did y'all at least visually look into the cars?
17   A.   From what they could see from plain view, yes.
18   Q.   Okay.  Mr. Pacheco claims to work as a plumber.
19   Did you see plumber tools in his car?
20   A.   So, specifically, I was not the one that looked
21   through these vehicles, these specific ones.  The only
22   one I've seen is the red one that's sitting at FBI
23   Houston right now.
24   Q.   Okay.
25   A.   But I am not the one that looked in the vehicle.
```

```
 1   Q.   So you don't know what's in them?

 2   A.   No.

 3            THE COURT:  Which is the red one you're talking

 4   about, vehicle number what?

 5            THE WITNESS:  It's vehicle number 4.

 6   BY MR. BERG:

 7   Q.   Now, in the course of this, cell phones were seized

 8   as well; right?

 9   A.   Say it again.

10   Q.   Cell phones were also seized?

11   A.   Yes.

12   Q.   Has there been any analysis of the defendant's cell

13   phones yet?

14   A.   We have not searched the phones yet.

15   Q.   Okay, so there is no search of phones, no search of

16   cars.

17            Are you aware of any text messages sent to

18   Mr. Pacheco?

19   A.   All I'm aware is that Mr. Ternawsky said that he

20   was sharing -- that they were all sharing locations

21   with the crew so that everybody knew where they were at.

22   Q.   Okay.  But that's what he said?

23   A.   Yes, but I have not looked in his phone to see if

24   there are any text messages.

25   Q.   So there's no confirmation that Mr. Pacheco got
```

1  those messages?

2  A.   No, sir, not to my knowledge.

3  Q.   So Mr. Pacheco was standing outside his vehicle?

4  A.   Not outside his vehicle.  He was standing -- so

5  Pacheco, as I stated earlier, when he arrived, he

6  parked across the street, so there was two sides.  So,

7  if you're driving in, there's two sides.  Vehicles 1,

8  2, 4, 5, and 6 were all on the right side.  Vehicle 3,

9  Pacheco's vehicle, was on the left side.

10  Q.   He was on the left side?

11  A.   Yes, and he got out and walked across the street to

12  join the other five individuals that were meeting --

13          THE COURT:  And when you say street, you mean

14  like the alley between --

15          THE WITNESS:  The alley --

16          THE COURT:  Wait.  The alley between the

17  garages?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Okay.

20  BY MR. BERG:

21  Q.   Okay.  So he wasn't parked with the other people.

22  A.   That's correct.

23  Q.   He walked over, and then when the bus went down, he

24  just stood there.

25  A.   Yes, he went with -- he went with commands that HPD

1  SWAT was giving.

2  Q.  And his vehicle was evidently not one of the ones

3  that was going to transport the drugs to Dallas or

4  Louisiana?

5  A.  Yes, sir, that's correct.

6          THE COURT:  Just so we don't have to keep

7  going through it, it was vehicle 1 and four that got

8  the pelican cases in them; correct?

9          THE WITNESS:  That's correct.

10          THE COURT:  All right.  So we don't have to go

11  over this stuff.  I know where the drugs were; okay?

12  I'm not trying to rush you, but I get it.

13          MR. BERG:  Oh, I know where the drugs were.

14  It's where the drugs weren't.

15          THE COURT:  Yeah, me too, so we don't have to

16  just -- that's why I was trying to tell you before.

17  BY MR. BERG:

18  Q.  Do you have any information about Mr. Pacheco's

19  immigration status?

20  A.  Me, I do not, no.

21  Q.  Okay.  Have those checks been done yet?

22  A.  People have been doing those checks.  It was not

23  personally me that did those checks.  So I'm not -- I

24  can't speak on his exact immigration status.

25          MR. BERG:  I'll pass the witness, Your Honor.

```
 1              THE COURT:  All right.  Mr. Martinez?

 2              MR. MARTINEZ:  Yes, Your Honor.

 3              THE COURT:  Do you want to use the podium?

 4              MR. MARTINEZ:  Yes, sir.

 5                      CROSS-EXAMINATION

 6   BY MR. MARTINEZ:

 7   Q.   Good morning, sir.

 8   A.   Good morning.

 9   Q.   I represent Peter Davila.  Do you know who he is?

10   A.   Yes, sir.

11   Q.   All right.  So, talking about how the drug

12   investigation started, there was a restaurant meeting

13   where your source met with one individual at the first

14   one; correct?

15   A.   Yes.

16   Q.   And Mr. Davila was not present at that meeting,

17   right?

18   A.   That's correct.

19   Q.   And at that meeting, these two individuals, not

20   Mr. Davila, were discussing about a transportation of

21   cocaine; correct?

22   A.   That's correct.

23   Q.   Then a subsequent meeting was held on June 22nd and

24   again at a restaurant; correct?

25   A.   That's correct.
```

1  Q.  And at that second meeting there were discussions

2  about drugs transportation; right?

3  A.   That's correct.

4  Q.   And Mr. Davila was not present?

5          THE COURT:  All right.  Just so we're clear,

6  meeting 1, who was there?

7          THE WITNESS:  It was Raul Ramirez Correa.

8          THE COURT:   Meeting 2, who was there?

9          THE WITNESS:  Raul Ramirez Correa and Embeer

10 Ternawsky.

11         THE COURT:  I get it.  I know that the client

12 that -- I know who was there and I know who wasn't

13 there.  I'm sorry to be -- but we're -- that' exactly

14 what I'm asking you not to do.  I am clear on who was

15 where.  I made sure to stop him and ask repeatedly.  I

16 made sure to ask him who were the names, who were the

17 people.  I get it.  So, just doing this, you know,

18 beyond a reasonable doubt trial thing isn't helping me

19 at all; okay?

20         Go ahead.

21 BY MR. MARTINEZ:

22 Q.  Just to make sure, the second meeting, Mr. Davila

23 is not there; correct?

24 A.   That's correct.

25 Q.   All right.

1            THE COURT:  I need a break.

2                We're going to take a five-minute break.

3        *[Brief recess]*

4            THE COURT:  All right, be seated, everyone.

5                I am asking everybody to please don't

6   repeat the facts that we've already heard.  I  know

7   who was at the meetings.  You don't have to say, okay,

8   but just making sure, let's talk about who's at the

9   meetings again.  I mean, I'm serious; okay?  I heard

10  the facts.

11               Go ahead.

12  BY MR. MARTINEZ:

13  Q.   The day of the event there was a meeting at IKEA;

14  right?

15  A.   That's correct.

16  Q.   And just, I didn't hear your answer, but you said

17  that Mr. Davila was present there; right?

18  A.   Yes.

19  Q.   But the conversations between the informant and a

20  defendant were had with Mr. Ternawsky; right?

21  A.   At IKEA?

22  Q.   Yes, sir.

23  A.   At IKEA, yes, there was a very brief conversation

24  as far as more so just saying, "Follow me to this

25  location."

1  Q.   Mr. Davila was not part of those conversations?

2  A.   At IKEA, no.

3  Q.   Okay.  Now, you mentioned that at the warehouse

4  Mr. Davila is in that group with the two sources;

5  correct?

6  A.   That's correct.

7  Q.   Did Mr. Davila say anything to those two sources?

8  A.   I can't tell you exactly what he said.  I know the

9  majority of the conversation was between Mr. Ternawsky

10  and Correa and the sources.

11  Q.   You don't know if Mr. Davila said anything;

12  correct?

13  A.   I don't know what he said.

14        THE COURT:  Other than Correa and Ternawsky,

15  do you know if anybody in that group said anything?

16        THE WITNESS:  No.

17  BY MR. MARTINEZ:

18  Q.   Now, the two pelican suitcases were not placed in

19  the car that Mr. Davila was in; correct?

20  A.   That's correct.

21  Q.   The money that was exchanged, that money was not

22  given to Mr. Davila; correct?

23  A.   Originally, no.

24  Q.   Well, when was it given to Mr. Davila?

25  A.   Well, I know it was given to Mr. Ternawsky, and

Agent ███████████ - Cross by Mr. Martinez                    57

1  then Ternawsky is the one that passed it out to other

2  people.  I didn't -- I don't recall seeing -- exactly

3  seeing him get that money; that's correct.

4  Q.  Okay.

5         THE COURT:  But he had chemical tagging on his

6  hands; right?

7         THE WITNESS:  Yes.  I didn't see him get

8  passed the money, but at some point --

9  BY MR. MARTINEZ:

10  Q.  Yeah, and I was going to get to that point.

11  A.  Yeah.

12  Q.  So the chemical that you guys put, it's to

13  transfer whatever it is onto a person or a surface;

14  correct?

15  A.  That's correct.

16  Q.  So, again, let's say, for example, you give the

17  money to me and then I hold it and I shake your hand.

18  There's a possibility that that chemical is going to be

19  transferred onto you; correct?

20  A.  It's a possibility, yes.

21  Q.  And you had never touched the money; right?

22  A.  I did not touch the money.

23  Q.  In this scenario, in the scenario that I'm

24  describing --

25         THE COURT:  I get it.  I understand.

1              MR. MARTINEZ:  Right.

2    BY MR. MARTINEZ:

3    Q.  And, well, you said that Ternawsky or Correa passed

4    around the money.  How much money, cash, did you find

5    on Mr. Davila?

6    A.  On Mr. Davila, I don't know if we got any money

7    off of Mr. Davila or if it was in the car.  We haven't

8    searched that stuff like that, so I wouldn't know.

9              THE COURT:  Did you search his person incident

10   to arrest?

11             THE WITNESS:  On his person, yes, I don't --

12   he didn't have any money on him.

13             THE COURT:  All right.  So the people that you

14   searched incident to arrest, you searched all of them;

15   right?

16             THE WITNESS:  Yes.

17             THE COURT:  Did you find money on any of them?

18             THE WITNESS:  No.  The money was all -- more

19   than likely, it was all in the vehicle.  We did not --

20             THE COURT:  Okay, not on their person?

21             THE WITNESS:  Not on their person; that's

22   correct, yes.

23             THE COURT:  Okay, got it.

24   BY MR. MARTINEZ:

25   Q.  Now, at this meeting you mentioned that Mr. Davila

1   goes and approaches three other vehicles; correct?

2   A.   That's correct.

3   Q.   What did he say?

4   A.   I don't know.

5   Q.   Did he say anything?

6   A.   He definitely said something.  I don't know what

7   he said.  You can see him talking on the camera.

8   Q.   Okay.  Well, did he say, "Any of y'all have a

9   cigarette?"

10  A.   Sir, I don't know what he said.

11          THE COURT:  He doesn't know what he said.  We

12  just covered that.  He doesn't know.

13  BY MR. MARTINEZ:

14  Q.   So it could have been something that's not

15  related -- not criminally related; correct?

16  A.   Yeah, that's correct.  I don't know what he said.

17  Q.   And, of course, these pelican suitcases that you

18  guys gave to them, I guess from somebody looking into

19  a car, you would just see a suitcase, you wouldn't see

20  cocaine; right?

21  A.   Yes, that's correct.

22          THE COURT:  Because there was no cocaine.

23  Nobody could have seen any cocaine.  There was no

24  cocaine.

25          MR. MARTINEZ:  Okay.

1  BY MR. MARTINEZ:

2  Q.   You mentioned a WhatsApp group chat between

3  individuals.  Is Mr. Davila part of that group chat?

4  A.   I don't know if Mr. Davila was part of that group

5  chat.

6  Q.   Now, you talked about TDA and Tren de Aragua.

7  Now, you understand that law enforcement has given

8  advisories of potential identifiers that could

9  associate somebody with Tren de Aragua; correct?

10 A.   That's correct.

11 Q.   Now, some of those identifiers would be a tattoo of

12 an AK-47; right?

13 A.   It could be.  I mean, I don't know if -- it could

14 be, yes, sir.

15 Q.   Okay.  Well, what are the identifiers of somebody

16 that's --

17 A.   I mean, most of them, they're going to have like

18 certain tattoos.  I can't tell you exactly which

19 tattoos they are going to be.  But most of them I

20 identify, like they will tell you that they're a member

21 of certain things or not.

22       THE COURT:  Wait a minute.  Do you have any

23 evidence, other than just sort of you have reason to

24 believe there's evidence that any of these defendants

25 are members of Tren de Aragua?

```
 1              THE WITNESS:  No.  I do know that some --
 2              THE COURT:  So no?
 3              THE WITNESS:  No, but some of them have
 4    admitted to being members of anti-Tren.
 5              THE COURT:  Okay.  Which admitted that they
 6    were members and when?  Did Mr. Correa admit that?
 7              THE WITNESS:  Yes.
 8              THE COURT:  When?
 9              THE WITNESS:  The night of his post-arrest
10    interview.
11              THE COURT:  Okay.  Did Mr. Pacheco admit that?
12              THE WITNESS:  Not to my knowledge, no.
13              THE COURT:  Okay.  Did Mr. Davila admit that?
14              THE WITNESS:  Not to my knowledge.
15              THE COURT:  Did Mr. Rodriguez-Garcia admit
16    that?
17              THE WITNESS:  Not to my knowledge.
18              THE COURT:  Did Dany Rojas admit that?
19              THE WITNESS:  Not to my knowledge.
20              THE COURT:  Did Pedro Hernandez Delgado admit
21    that?
22              THE WITNESS:  Not to my knowledge.
23              THE COURT:  Did Ismael Leon Berbin admit that?
24              THE WITNESS:  Not to my knowledge.
25              THE COURT:  Did Jesus Fernandez Troconiz admit
```

1  that?

2          THE WITNESS:  Not to my knowledge?

3          THE COURT:  And did Mr. Ternawsky admit that?

4          THE WITNESS:  Yes, he did.

5          THE COURT:  Thank you.  Go ahead.

6  BY MR. MARTINEZ:

7  Q.   Just the last two or three questions.  No large

8  amounts of currency on Mr. Davila incident to arrest.

9  Did you find any weapons on him?

10 A.   Not on him, no.

11 Q.   Did you find any drugs on him?

12 A.   Not on him, no.

13         THE COURT:  There was no drugs found.  There

14 was no money found.  We already know that as to

15 everybody.

16         MR. MARTINEZ:  That's all I have.

17         THE COURT:  Okay, thank you.

18             Mr. Vasquez?

19                    **CROSS-EXAMINATION**

20 **BY MR. VASQUEZ:**

21 Q.   Just a few questions.

22         You said in vehicle number 1, at the first

23 location, there was Troconiz and Mr. Rodriguez;

24 correct?

25 A.   That's correct.

1  Q.   Where was Mr. Rodriguez seated in the car?

2  A.   In the passenger seat.

3  Q.   And you testified that the source spoke only to

4  Mr. Ternawsky; correct?

5  A.   The majority of the conversation was Ternawsky and

6  Correa from what I could see, yes.

7  Q.   But not Mr. Fernandez, as far as you know?

8  A.   As far as saying hello, no.  I wouldn't know.

9  Q.   And you indicated you saw Mr. Fernandez get out of

10 the vehicle; is that correct?

11 A.   Yes.

12 Q.   Okay.  What did he do once he got out of the

13 vehicle?

14 A.   He got out of the vehicle and stood in the group

15 with the other five individuals talking to the source --

16 with the other four individuals, I'm sorry.

17 Q.   But, to your knowledge, the source didn't speak

18 directly to him; correct?

19 A.   Other than saying hello, that's correct.

20 Q.   Do you know Mr. Rodriguez's immigration status?

21 A.   I believe he is not here legally to my knowledge,

22 yes.

23 Q.   Do you know if he's applied for any kind of relief

24 from immigration?

25 A.   I do not know that, no, sir.

```
 1              MR. VASQUEZ:  I have nothing further, Judge.
 2              THE COURT:  All right.  Mr. Troiani?
 3                         CROSS-EXAMINATION
 4   BY MR. TROIANI:
 5   Q.   Good morning.
 6   A.   Good morning.
 7   Q.   My understanding, based on your prior testimony,
 8   is that there was there was no communication between
 9   Mr. Rojas and any of the informants; is that correct?
10   A.   That's correct.
11   Q.   And you have no information as to what was said to
12   him as to why he should be at the storage unit;
13   correct?
14   A.   That's correct.
15   Q.   And it's also my understanding that the agent that
16   was placed on the money, that's transferrable,
17   inherently transferrable; correct?
18   A.   Correct.
19   Q.   And there is no information you have, no
20   information to indicate that Mr. Rojas handled or
21   touched any money at any time while he was at the
22   storage location; correct?
23   A.   That's correct.
24   Q.   You're aware that Mr. Rojas is a Lyft driver;
25   correct?
```

1   A.   I was not aware of that.

2   Q.   Are you aware of his immigration status?

3   A.   Not as far as all of their immigration statuses.

4   Yeah, I know they all entered the country in the last

5   couple of years.  As far as them -- what is the word

6   I'm looking for?  If they've applied for anything, then

7   I can't speak to them.  I don't work in immigration.

8   Q.   So, if the report indicates -- the Pretrial

9   Services Report indicates that he has a Social Security

10  number and they've confirmed his date of birth and his

11  employment, you have no -- you are not disputing that;

12  correct?

13  A.   I'm not disputing that, no.

14  Q.   Okay.

15          MR. TROIANI:  I'll pass the witness.

16          THE COURT:  Ms. Soderlund?

17          MS. SODERLUND:  Thank you, sir.

18                   **CROSS-EXAMINATION**

19  **BY MS. SODERLUND:**

20  Q.   Good morning, ████  ██████████.

21  A.   Good morning.

22  Q.   You mentioned that in the first location -- which

23  is the IKEA?

24  A.   That's correct.

25  Q.   -- the source was followed by certain vehicles;

1  correct?

2  A.   Yes.

3  Q.   Do you remember the color or the makes of those

4  cars?

5  A.   One was a Toyota 4-Runner.  It's black.  One was a

6  silver sedan.  I can't tell you off the top of my head

7  which one it is.  Then there was a -- I want to say it

8  was a gray like hatchback type vehicle.

9  Q.   And do you remember which one of those cars was

10 Mr. Correa in?

11 A.   Mr. Correa?

12 Q.   Yeah.

13 A.   Ramirez, Raul Correa?

14 Q.   Yes.

15 A.   In the silver vehicle that was at IKEA.

16 Q.   So, when they moved to the second location, which

17 was, I gather, a warehouse -- I mean a storage

18 facility?

19 A.   Yeah, I'm saying service.  I kind of help describe

20 like the name, yes.

21 Q.   Was it well lit?

22 A.   Yes.

23 Q.   And did you have a clear line of sight?

24 A.   Yes.

25 Q.   And you know the order of the cars that they went

1  in; right?

2  A.   Yes.

3  Q.   So Mr. Hernandez Delgado --

4  A.   Yes.

5  Q.   -- what car was he riding in?

6  A.   There was a red vehicle.  I can't say the make of

7  it right now.  I know it was a red vehicle.

8  Q.   And you mentioned that you remember where they were

9  parked relative to each other; correct?

10 A.   Yes, that's correct.

11 Q.   Was he parked close to the lead car, number 1?

12 A.   He was -- there was one car inbetween him and the

13 lead car.

14 Q.   And was there anybody else in the car?

15 A.   With him?

16 Q.   Yes.

17 A.   To my eyes, no.

18 Q.   And did he get out of the car at any moment when

19 the transfer of the pelican boxes, cases was done?

20 A.   No, they -- Mr. Correa brought the pelican case to

21 his vehicle -- to the vehicle he was in and placed it

22 inside of that vehicle.

23 Q.   And could you see where he put it?

24 A.   It looks like in the back right seat, that's where

25 Correa accessed the vehicle from.

1  Q.  Back right seat.  I mean, if he was in the

2  driver's seat, how did Mr. Correa access the car?  What

3  side?

4  A.  The right side of the car, the back right

5  passenger.

6  Q.  On the opposite side?

7  A.  Yes.

8  Q.  Okay.  And did he touch or get out to do anything

9  with that case?

10  A.  Not that I could see.

11  Q.  Did he come close to the other -- you haven't said.

12  Where was the money delivered?

13  A.  Say it again.

14  Q.  The chem tag money, how was it delivered?  In a

15  box, in a bag?

16  A.  They handed it to them.  The source handed the

17  money.  Are you talking about the money or the --

18  Q.  Bundles of money.

19  A.  Yes, it was --

20  Q.  So they were handed bundles of money?

21  A.  They handed the money, yes, to the --

22          THE COURT:  She's asking, was it in something?

23          THE WITNESS:  No, it was just money, they way

24  the handed the money.

25          THE COURT:  Was it wrapped in anything?

1          THE WITNESS:  No, it was not wrapped.  It was

2    like handing money -- I mean, I believe it had like the

3    bank --

4    BY MS. SODERLUND:

5    Q.   The paper binding?

6    A.   -- sticker, like I said, like a thousand dollar

7    around them.  But other than that, it was just handed

8    directly, not inside of a bag.

9    Q.   Was there any conversation between them?

10   A.   Between?

11   Q.   Between Correa and Hernandez that you could see?

12   A.   Not that I could see.  Well, I mean, I saw them go

13   to the vehicle, but from where the camera was at, you

14   could see them go to the back right side of the vehicle

15   and then he disappears on the -- because he's leaning

16   inside the vehicle.

17   Q.   Okay.  And did Mr. Delgado have chem tag on his

18   hands?

19   A.   To my knowledge, no.  I don't believe so.

20   Q.   And you mentioned that he gave a statement.  Did

21   he say he was a member of any criminal organization?

22   A.   No.

23   Q.   Did he have any tattoo that indicated to you that

24   he may be in a criminal organization?

25   A.   Oh, I haven't seen any of his tattoos, so I

1  wouldn't know.

2  Q.   And I know you have mentioned that you have not

3  seen the phones.

4  A.   That's correct.

5  Q.   But did you hear from anybody, in the storage or

6  conversations you heard, did you hear that Mr. Delgado

7  was participating in any of those conversations setting

8  up this thing?

9  A.   Well, he wasn't near the sources when they had

10 the -- he was in his vehicle where the drugs -- where

11 the box -- where the pelican case was placed into.

12 Q.   Prior to that?

13 A.   Prior to that --

14 Q.   I mean, was he participating in any texts that you

15 could see or know, or any conversation between the

16 source and the other participants, allegedly?

17 A.   I do know that during one of the buys, when we were

18 trying to purchase a grenade from Mr. Ternawsky, that

19 the source arrived and there were six individuals

20 sitting inside.  And the source says, "These are your

21 drivers, these are the people that are transporting

22 your stuff."  And I know the source has identified

23 multiple of them.  I can't remember off the top of my

24 head if it's Delgado.  I know Mr. Davila was one, but

25 as far as -- I can't confirm that, no.  No, ma'am.

1  Q.   Was that the meeting when they were talking about

2  kidnapping, that we say we're not going to discuss?

3  A.   That was a separate one.

4  Q.   Another meeting?

5  A.   Yes.

6  Q.   That would be a third meeting?

7  A.   So there's been multiple buys.  And like I said

8  earlier, there's been multiple conversations as far as

9  the grenades and AT4s and different things of that

10 nature and the kidnappings.  Just to be specific, I

11 don't believe -- Mr. Delgado was not there for the

12 kidnapping conversations, if that's what you're asking.

13 Q.   Was he there present when they were talking about

14 the grenades?

15 A.   To my knowledge, I believe he was there.

16 Q.   But you're not sure?

17 A.   I can't confirm, like I just said.

18 Q.   Okay.

19 A.   To the best of my knowledge.

20 Q.   And did the source at any time mention his name?

21 A.   No.

22 Q.   And again, are you aware of any status or any

23 proceeding under which Mr. Hernandez may be right now --

24 A.   No.

25 Q.   -- in immigration?

 1  A.    No.

 2  Q.    That's all.  Thank you.

 3              THE COURT:  All right.  Mr. DeGeurin.

 4                    **CROSS-EXAMINATION**

 5  **BY MR. DEGEURIN:**

 6  Q.    Good morning, Agent.  I'm going to give you a shot.

 7  Give me any evidence that you have against Mr. Berbin,

 8  other than his mere presence at the warehouse, to have

 9  him linked to any other of these defendants or any

10  gang, whether Tren de Aragua or anti-Tren.  Give me any

11  evidence, other than him there, that he was connected

12  to it.

13  A.    Well, he said that he was told to come by a guy

14  named Pelon, who we know to be an anti-TDA member, who

15  was also involved in a shooting of a TDA member a

16  couple of months prior.

17  Q.    Okay.  And where is that information that you're

18  giving me right now?  Is that in the report?

19  A.    Yeah, I didn't write the report, but it will be in

20  the report.

21  Q.    But you reviewed the report?

22  A.    That specific report, this is what I've been told

23  by people that did these interviews.

24  Q.    Did you intentionally not review reports so that

25  you wouldn't be able to provide them to us today?

```
 1   A.    No, I reviewed the reports.

 2               THE COURT:  Hold on.  Just slow down, okay?

 3   BY MR. DEGEURIN:

 4   Q.    Have you reviewed any reports prior to today?

 5   A.    I haven't reviewed every single one of their full

 6   interviews.

 7               THE COURT:  Have you reviewed reports, yes or

 8   no?

 9               THE WITNESS:  Yes, I have.

10               THE COURT:  All right.

11   BY MR. DEGEURIN:

12   Q.    Okay.  And you reviewed reports about Mr. Berbin

13   specifically?

14   A.    The report of the night of him being arrested, yes.

15               MR. DEGEURIN:  Okay.  I'd like to have a copy

16   of that.  I'm entitled to it.

17               THE COURT:  Well, just -- can you give him a

18   copy?

19               MR. LEO:  I don't have it.

20               THE COURT:  All right.  Because that's not how

21   this works.  You get -- listen to me.  You get a copy

22   of the reports he either prepared or that were prepared

23   by somebody else that documents his part of the

24   investigation.

25                   So were you at the interview of him?
```

```
 1              THE WITNESS:  I was not.

 2              THE COURT:  Then you don't get it under

 3   Jencks.  I've done the research, I'll give you the

 4   cases later.  You don't get it.

 5              MR. DEGEURIN:  I understand, Judge.  I did ask

 6   for these reports before

 7              THE COURT:  Okay.

 8              MR. DEGEURIN:  Let me ask another --

 9              THE COURT:  This is pre-Indictment.  There are

10   going to be a lot of reports.  And what you're saying

11   you're entitled to, I'm telling you you're not.  You're

12   wrong.  To the extent that reports exist, that he wrote

13   or that he adopted, you get those.  Reading it doesn't

14   mean adopting it.

15              MR. DEGEURIN:  I understand.

16              THE COURT:  Okay.

17   BY MR. DEGEURIN:

18   Q.  I'm going to ask another question.  I accepting

19   what you're saying.  You said that you reviewed the

20   interview of Mr. Berbin.

21   A.  I said I reviewed the arrest of Mr. Berbin.  I've

22   talked to the people that interviewed Mr. Berbin.  I

23   know I'm mispronouncing his last name.  I apologize.

24   Q.  Yeah.

25              MR. DEGEURIN:  Well, let me clarify something,
```

 1  Judge.

 2  BY MR. DEGEURIN:

 3  Q.   Earlier today I gave you a -- or I gave to Mr. Leo

 4  and he gave you a copy of Mr. Berbin's immigration

 5  status; right?

 6  A.   That's correct.

 7  Q.   And I think you actually still may have it.

 8  A.   No, I gave it back.  I gave it back.

 9  Q.   Oh, I have it.  Do we now know -- you now know

10  Mr. Berbin's current status; right?

11  A.   That's correct.

12  Q.   And you've actually been able to verify his status?

13  A.   I've verified --

14          THE COURT:  Just what's his status?

15          THE WITNESS:  That his parole has been

16  terminated for him being here.

17  BY MR. DEGEURIN:

18  Q.   When was his parole terminated?

19  A.   I've just been given -- we contacted our people

20  that work with ERO --

21          THE COURT:  Was it terminated when the

22  President issued an executive order terminating

23  everybody's probation?

24          THE WITNESS:  No, it was terminated when he

25  committed a crime that therefore violated his parole.

1  BY MR. DEGEURIN:

2  Q.   You terminated it today?

3  A.   I can't tell you.  I didn't terminate it myself.

4  Q.   You didn't know who he was.  You had the wrong name

5  until just this morning.

6  A.   And then you asked us to check it and we asked and

7  that's the information I was --

8  Q.   Right.  So, as of this morning, he was here

9  legally?

10 A.   As of this morning, you gave me a piece of paper

11 that told me a name.  I reached out to the ERO and

12 that's the information I was given.

13 Q.   And now they're attempting to revoke that parole?

14 A.   I'm giving you the information that I was provided.

15           THE COURT:  What was his parole for?  Was it

16 like humanitarian?

17           THE WITNESS:  No, sir.  When he got here, he

18 applied for not asylum, but his immigration status, and

19 he was given parole until, was it --

20           THE COURT:  Because a bunch of them got

21 revoked sort of by general order.

22           MR. DEGEURIN:  I'm going to mark Defendant's

23 Exhibit A.

24           THE COURT:  Just why don't you just tell me

25 what you're going to tell me.

Agent ███████████ - Cross by Mr. DeGeurin                              77

```
1              MR. DEGEURIN:  Judge, he was in Mexico --
2              THE COURT:  He was legally until today?
3              MR. DEGEURIN:  Yes.
4              THE COURT:  Okay, got it.
5              MR. DEGEURIN:  He's still here legally.  They
6   filed --
7              THE COURT:  All right, he's here legally.
8              MR. DEGEURIN:  -- a motion to revoke his
9   parole this morning.
10             THE COURT:  Okay, okay, I accept it.  He's
11  here legally.
12             MR. LEO:  Objection.  We don't know that
13  we've --
14             THE COURT:  I'm just accepting what he's
15  telling me.  I don't -- just let's move on because he
16  basically just said that.
17  BY MR. DEGEURIN:
18  Q.  You have identified Mr. Berbin.  And for the
19  record, I'm saying B-e-r-b-i-n is the proper spelling.
20  Mr. Berbin was in car 6?
21  A.  That's correct.
22  Q.  He was a passenger in car 6?
23  A.  That's correct.
24  Q.  Did you take a phone from Mr. Berbin?
25  A.  I believe they took everybody's phones, yes.
```

1  Q.   Did you take any weapons from Mr. Berbin?

2  A.   He did not have a weapon, no.

3  Q.   There was no weapons in the car?

4  A.   We haven't searched the car.

5  Q.   You didn't do a protective sweep of the car?

6  A.   No, we didn't search the car to make sure we got a

7  search warrant to lawfully go in there and seize

8  everything.

9  Q.   So, at this point you have no information about

10 what's in his phone or what's in the car?

11 A.   That's correct.

12 Q.   Now, he was interviewed?

13 A.   That's correct.

14 Q.   And he told you that he had nothing to do with it;

15 right?

16 A.   He said that he was there to do a job and make

17 money.

18 Q.   To make -- a job, but not to transport or to

19 protect or to kidnap any of that.  He was there to do a

20 job?

21 A.   That's what he said, yes.

22 Q.   And so once again, you have no evidence that he's a

23 member of El Tri -- I mean, not El Tri.  El Tri is the

24 football --

25            THE COURT:   Anti-Tren.

1  BY MR. DEGEURIN:

2  Q.   Anti-Tren?

3  A.   I know that he admitted to being told to come here

4  by a person that we know is a member of anti-Tren.  So

5  therefore, that's --

6  Q.   But you have no indication that he is?

7  A.   That's correct.

8            THE COURT:  So the problem is, when you ask

9  him a question and he's in the middle of answering it

10  and then you interrupt him, it creates a difficult

11  record.  I have a hard time listening.  You know,

12  maybe your client appreciates the way you're asking

13  questions, but it doesn't help me.  I'm just letting

14  you know; right?

15            MR. DEGEURIN:  I --

16            THE COURT:  The idea of these hearings, when

17  the ruling is coming from the bench, is to help me

18  understand the evidence.  If what you want to do is

19  argue with the agent, I'll just tune out; right?  I'll

20  just sit here and let you do it.  But go ahead.

21            MR. DEGEURIN:  Judge, I understand what you're

22  saying, but here's the reality, is that I gave them

23  information today to show that he was here lawfully.

24  And while we were sitting here, they go and try to

25  revoke his parole.

Agent ██████████ - Cross by Mr. DeGeurin                          80

```
 1            THE COURT:  I heard you.

 2            MR. DEGEURIN:  And so am I upset.

 3            THE COURT:  I heard you.

 4            MR. DEGEURIN:  Yes, I'm upset.

 5            THE COURT:  All right.  Well, stop being upset

 6   and move on.

 7            MR. DEGEURIN:  Okay.  And the --

 8            THE COURT:  I don't want you to talk to me.  I

 9   want you to ask him questions.

10            MR. DEGEURIN:  I understand.  But, however, he

11   just put something out there during my Cross that we

12   have no reports on, it's not in this thing.  He got it

13   somewhere.

14            THE COURT:  I don't even know what you're

15   talking about at this point.

16            MR. DEGEURIN:  Well, good, then I'll leave it

17   because right now they have no --

18   BY MR. DEGEURIN:

19   Q.  You have no evidence that he was -- had any

20   contact?

21            THE COURT:  So that's my question.  That is --

22   I am supposed to look at all the facts that have been

23   presented and decide whether there's probable cause.

24            MR. DEGEURIN:  Right.

25            THE COURT:  I will decide what the evidence is;
```

1   okay?

2           MR. DEGEURIN:  All right.

3   BY MR. DEGEURIN:

4   Q.   Did you review his statement?

5   A.   I just said I talked to the people that interviewed

6   him.  I've reviewed the arrest report --

7   Q.   Okay, and that arrest report --

8   A.   -- of the night of the arrest.

9   Q.   -- has what was said in his interview?

10  A.   No, it does not.  There's a separate report that's

11  being written, not by me, of what he said in his

12  interview.

13  Q.   But your testimony right now is that you're

14  adopting what that person has told you as to what he

15  said?

16          THE COURT:  That's not what adopting means.

17  That's not what adopting means.  It just means he read

18  it, he listened to it.  It's not what it means.  It

19  just isn't.

20  BY MR. DEGEURIN:

21  Q.   Is it your testimony today that you know what he

22  said during his post-arrest statement?

23  A.   My testimony is that what I was told was that he

24  said that he was there to do a job, that he was brought

25  by Pelon, a known Anti-Tren member that was involved in

1  a shooting a couple of months prior.

2  Q.   You know Pelon to be part of something, but you

3  don't know that Mr. Berbin -- you're not saying

4  Mr. Berbin says he's a part of this?

5  A.   Well, I don't know what he knows as far as this

6  person.  I'm telling you what I know.

7  Q.   Right.  But you're saying you're learning from the

8  statement that he has some tie to Anti-Tren.  But the

9  statement that you're --

10         THE COURT:  I'm not really worried about the

11  Anti-Tren stuff, to be honest with you.  Just worried

12  about people showing up at a setup drug deal.  I mean,

13  just move on.  I get it.  I hear you.

14  BY MR. DEGEURIN:

15  Q.   Prior to showing up at the warehouse, the sting

16  site location, is there any indication anywhere in the

17  FBI or ATF or anything that has identified Mr. Berbin?

18  A.   Not to my knowledge.

19         MR. DEGEURIN:  I pass the witness.

20         THE COURT:  All right.  Mr. Mosbacker.

21                    **CROSS-EXAMINATION**

22  **BY MR. MOSBACKER:**

23  Q.   Agent ██████, I want to clarify a few things about

24  my client, Mr. Fernandez Troconiz.  The first time you

25  had any contact with him was that night when he was the

1  driver of the sixth car that pulled up?

2  A.   That's correct.

3  Q.   Is that right?

4  A.   That's correct.

5  Q.   And you did not see any interaction between my

6  client and anybody else?

7  A.   I saw interaction -- well, I mean, I saw him go to

8  the car -- appeared to go to the car that he was

9  sitting in and speak to people.  I couldn't tell you

10 which person he talked to, but --

11 Q.   Well, you said that Davila, is that who you said --

12 A.   Yes.

13 Q.   -- did that?

14 A.   Yes.

15 Q.   That he looked into the car?

16 A.   Yes.  And you can see him saying something.  I

17 can't tell you what he said or specifically who in the

18 car he said it to.

19 Q.   And he was looking at the passenger side?

20 A.   He went into the passenger side, yes.  So he would

21 have been able to see the driver, too.

22 Q.   He looked into the passenger side?

23 A.   Yes, the passenger's window was open,  yes.

24 Q.   My client was the driver?

25 A.   That's correct.

1  Q.   And you have no idea what was said between the two?

2  A.   I don't know what was said, no.

3  Q.   In fact, my client -- you said earlier that there

4  was some kind of group call or group chat between

5  several of these people?

6  A.   That's what was told to us by Mr. Ternawsky.

7  Q.   Oh, so you're relying on his word that they had a

8  group call?

9  A.   I'm just telling you what I know.  We haven't

10 searched their phones yet.

11 Q.   Okay.  My client was not part of that?

12 A.   I don't know.  We haven't searched their phones

13 yet.

14 Q.   Do you have the video of what happened there at

15 that warehouse?

16 A.   On my person right now or are you saying --

17 Q.   Do you have video recordings?

18 A.   Yes, the entire thing was recorded, yes.

19 Q.   When will we get access to that?

20 A.   I mean, you'd have to talk to the AUSAs about that

21 as far as when they give you guys that.

22 Q.   When he was arrested, he gave a statement,

23 evidently, saying that he worked in construction; isn't

24 that right?

25 A.   To my knowledge, yes.

1  Q.   And you said that his car was, I guess, towed away?

2  A.   Yes.

3  Q.   And that you got search warrants?

4  A.   No, I never said we had search warrants for them.

5  I said we had not searched them because we are waiting

6  to get search warrants.

7  Q.   So you're still waiting to get search warrants?

8  A.   We have not got a search warrant for it yet; that's

9  correct.

10  Q.   Why not?

11  A.   Because we were tracking down other members of the

12  organization that were involved in a separate offense

13  the same night, which kind of took our attention away

14  as far as getting the other individuals that fled the

15  scene.

16  Q.   Well, would it surprise you to hear, and you know

17  that there were no weapons found in his vehicle.

18  A.   Well, I don't know because we haven't searched the

19  vehicle yet.

20  Q.   They did a sweep for security, didn't they, the

21  police officer?

22  A.   I did not see them do a sweep.  I have no knowledge

23  of them doing a sweep.  I know I have not searched the

24  vehicle.  The FBI has not searched his vehicle.

25          THE COURT:  Did they not do a --

```
 1              THE WITNESS:  He was not arrested --
 2              THE COURT:  Wait, wait, wait, whoa, whoa.
 3              THE WITNESS:  I'm sorry.
 4              THE COURT:  They didn't do an inventory search?
 5              THE WITNESS:  No.  So, at this location we did
 6    not an inventory search, but specifically depend on the
 7    search warrant.
 8              THE COURT:  Did they tow the vehicle?
 9              THE WITNESS:  Yes, all the vehicles were towed
10    to FBI Houston, yes.
11              THE COURT:  And you didn't do an inventory?
12              THE WITNESS:  Yes, that is correct, to my
13    knowledge.
14              THE COURT:  Who towed them?  Like tow truck
15    drivers or FBI people?
16              THE WITNESS:  They were tow truck drivers, but
17    they were followed by FBI Agents from the location to
18    FBI Houston.
19              THE COURT:  All right.
20    BY MR. MOSBACKER:
21    Q.  So would it surprise you to learn that in the trunk
22    of his vehicle all that was there were construction
23    tools?
24    A.  Well, I wouldn't know.  I haven't been in the
25    vehicle.
```

1  Q.   And obviously there was no money found on him?

2  A.   That's correct.

3  Q.   No weapon found on him?

4  A.   That's correct.

5  Q.   You did seize his wallet, didn't you?

6  A.   It's in the Marshal custody.  We didn't actually

7  seize his wallet.

8  Q.   Did you know that in his wallet he had a work

9  permit?

10 A.   I didn't look in his wallet, sir.

11 Q.   And that he had a Social Security card?

12 A.   Did not know that, sir.

13 Q.   So all you know about him is that he showed up?

14 A.   I know that he showed up and I know what statements

15 he gave that I've already stated.

16 Q.   Yes, statements that do not implicate him in this

17 case?

18 A.   Well, he said he was there to visit with Mr. Jesus,

19 that he was paid to transport people to Dallas.  So, I

20 mean, that's the statement --

21 Q.   He was paid to transport people to Dallas, a person

22 to Dallas?

23 A.   That's the statement he gave and that's what I'm

24 telling you.

25          MR. MOSBACKER:  Pass the witness.

1              THE COURT:  Mr. Acevedo?

2              MR. ACEVEDO-CARLSON:  Thank you, Your Honor.

3                        **CROSS-EXAMINATION**

4    **BY MR. ACEVEDO-CARLSON:**

5    Q.   Agent ████, my client has an asylum petition

6    pending.  Do you have any evidence to dispute that?

7    A.   I don't know.

8    Q.   My client has no prior criminal history in the

9    United States.  You have no evidence to dispute that;

10   correct?

11   A.   That's correct.

12   Q.   My client was employed lawfully in the United

13   States with an employment authorization given by the

14   Government of the United States.  You have no evidence

15   to dispute that; correct?

16   A.   I don't.

17   Q.   My client did not act in any violent way towards

18   any of the agents involved in this investigation?  I'm

19   talking about Mr. Ternawsky.

20   A.   Violently, as far as him getting arrested, like --

21   Q.   Aside from him getting arrested, there's no threats

22   to agents, no kind of acts of violence towards any of

23   the people involved?

24   A.   Not that I know of.

25   Q.   My client has a lawful driver's license in the

Agent ███████████ - Cross by Mr. Acevedo                    89

 1  state of Texas; correct?

 2  A.   That's correct.

 3  Q.   Aside from the Government saying that my client was

 4  a member of a gang named Anti-Tren, do you have any

 5  specific evidence that was given to you or to any

 6  agents of the Task Force that you were involved in,

 7  proving that he had any tattoos or any identification

 8  showing that he was Anti-Tren?

 9  A.   No tattoos identification, but he did say he was --

10  he actually wrote it down on a piece of paper, showed

11  the agents, ripped it, and ate the piece of paper that

12  said he was Anti-Tren.

13  Q.   Okay.  And that will be recorded on video camera?

14  A.   I do not believe that interview was recorded.

15  Q.   Okay.  So it wasn't recorded.  It's just because

16  you say it?

17  A.   No, I wasn't the one that interviewed him.  I just

18  know what the interviewing agents and linguists told me.

19  Q.   Are you telling the Court that you personally saw

20  him eat a piece of paper?

21          THE COURT:  No, no, no, no, he's not saying

22  that.

23          THE WITNESS:  I just --

24          THE COURT:  He's saying that people that

25  interviewed --

```
 1              THE WITNESS:  I just -- I'm sorry.
 2              THE COURT:  So the people that interviewed him
 3   told him that.
 4   BY MR. ACEVEDO-CARLSON:
 5   Q.   You have no clue if they were joking about being
 6   any kind of gang members; right?
 7   A.   Well --
 8              THE COURT:  You don't know.
 9              THE WITNESS:  Yeah.
10              THE COURT:  He doesn't know.
11   BY MR. ACEVEDO-CARLSON:
12   Q.   Okay.  The group text that you mentioned, you don't
13   know Spanish; right?
14   A.   No, I do not know Spanish.
15   Q.   To this day, have you reviewed any of those group
16   texts?
17   A.   The group texts, I have not.  I don't speak
18   Spanish.
19   Q.   The only way you think there is a group text is
20   because somebody else told you there was a group text?
21   A.    No, we have an FBI source that has talked to him.
22   Are you talking about -- what situation are you talking
23   about?
24   Q.   We are talking about the group texts providing
25   locations or pings to get locations.
```

1  A.  As far as to the other defendants or as far as to

2  where he needed to be at?

3  Q.  As it pertains to my client, Mr. Ternawsky, is it

4  your claim that he was sharing locations using an

5  electronic device with other members of the people that

6  are in this room?

7  A.  That is correct.  He told the source that he was

8  sharing the location of everybody.  That's how everyone

9  else, the other three vehicles knew how to get to the

10 location of where the arrest happened because we never

11 gave out that address.

12 Q.  You said that was an agent speaking to several --

13 was sticking his head into the vehicles and speaking to

14 several of the people in this room?

15 A.  You said an agent or --

16 Q.  Maybe I misunderstood.  I believe you said an agent

17 was speaking?

18 A.  I never said an agent.  I said Peter Davila walked

19 to multiple vehicles after their initial conversation

20 and spoke to vehicles 4, 5, and 6.  Mr. Ternawsky was

21 in the original group of five people with the two

22 sources when they were originally told that there were

23 seven to eight kilograms of cocaine.

24 Q.  Okay.  Did you ever hear my client say or give

25 instructions to anybody about anything concerning

```
1   transportation of drugs?
2   A.   Yes.  So, at this specific offense, he was the main
3   one having the conversation with the sources.  And also
4   at prior meetings he said multiple times, "I'm going to
5   have two transport vehicles -- two load vehicles and
6   two transport vehicles for each load," basically, if
7   that makes sense.  So, I'm sorry, let me clarify.  One
8   load vehicle that's going to have the drugs in it, and
9   two transport vehicles to follow each load.  So,
10  therefore, six vehicles in total.  So, therefore, as
11  far as giving direction, he had made that very clear on
12  multiple occasions that that's what's going to be
13  happening.
14  Q.   You mentioned grenades and grenade launchers during
15  your testimony; is that right?
16  A.   That's correct, yes.
17  Q.   Do you have any way to distinguish between somebody
18  boasting about having such devices and actually having
19  access to such devices?
20  A.   Well, there were pictures of the devices sent to
21  us.
22  Q.   Okay.  And those pictures are in evidence with the
23  Task Force?
24  A.   They were in the text messages that you will get at
25  some point.
```

1  Q.   Okay.  Did my client at any point, in any of the

2  meetings that you mentioned today, have any weapons on

3  him?

4  A.   Yes.  That night I believe he had a weapon with an

5  extended mag on them, I believe.  I don't know if it

6  was on them or sitting right there on top of his

7  vehicle.  I know there was a weapon that tied to him

8  that night.

9  Q.   Okay.  I believe you told the Court that the

10  persons of each of these individuals were searched.

11  A.   Persons, yes, yes, that's correct.  I don't believe

12  it was on his person.  I believe -- I know there was a

13  weapon found that was associated with him.  I can't

14  remember exactly where it was located.  I know that he

15  had a weapon.

16  Q.   You don't know where it was located?

17  A.   I can't remember off the top of my head right now,

18  but I could get that answer.

19  Q.   It could have been in vehicle 6?

20  A.   It definitely wasn't in vehicle 6, it was between --

21  vehicle 1.  It was definitely vehicle 1.

22  Q.   Okay.

23  A.   So we didn't --

24  Q.   Now you're saying you don't know.  Now you're

25  saying you do know.

1  A.   But I'm saying -- I'm saying the vehicle that he is

2  in, that's the only way that we were able to tie that

3  weapon to him.  I'm not the one that did that is what

4  I've stated multiple times at this point.  I do know

5  there was a weapon found tied to this man.

6  Q.   But on his person there was no --

7  A.   On his person, no, to my knowledge.

8  Q.   Did my client --

9  A.   To my knowledge, no.

10  Q.   Did my client run when the bust occurred?

11  A.   No, he did not run.

12  Q.   Did he fully cooperate with the arrest?

13  A.   Yes, he did.  I do know when he was in custody, he

14  did break out of his handcuffs to the point where the

15  Marshals did have to put a special device on his

16  handcuffs for him to stop doing that.

17  Q.   Okay.  You said there were several meetings, one of

18  them in a restaurant?

19  A.   Yes.

20  Q.   Were these meetings recorded?

21  A.   Yes, they were.

22  Q.   With cameras or with audio only?

23  A.   Audio and video.

24  Q.   And video.  And what meeting did my client,

25  Mr. Ternawsky, write on a piece of paper he was

1  anti-Tren and chew it in his mouth?

2  A.   That was the post-arrest interview like I stated

3  earlier.

4  Q.   Okay.  During the restaurant meeting, did anybody --

5  did Mr. Ternawsky promise to transport any illegal

6  substances outside the state of Texas?

7  A.   Yes.

8  Q.   To what state?

9  A.   To Louisiana.

10  Q.   And that will be recorded?

11  A.   Yes, that's recorded and I believe in text messages

12  as well.

13  Q.   It came out of his mouth that he would transport or

14  help transport --

15  A.   Yes.

16  Q.   -- drugs outside the state of Texas?

17  A.   Yes.

18  Q.   Okay.  What meeting specifically was that at?

19  A.   It was either June 8th or June 22nd.  And June 8th,

20  to clarify for earlier, Correa was the only one

21  present, but Correa also Facetimed Mr. Gutierrez

22  Ternawsky while he was there.  So as far as being

23  present, Correa was the only one present there, but he

24  was also on the phone.  I can't remember which one he

25  said it at, but I know it was said.

1  Q.  You would be surprised to learn, if it came out,

2  that the only discussion concerned transporting the

3  vehicles to Dallas?

4  A.  No, it was definitely two loads.  And I can't

5  remember, I believe the source sent the location that

6  they were going to, to them, that night of.  So they

7  knew one was going to Louisiana, yes.

8  Q.  Okay.  There was some testimony about some other

9  defendant having his wife deliver or cooperate with the

10  delivery of a weapon.

11  A.  That's correct.

12  Q.  That was not Mr. Ternawsky?

13  A.  Not that one, no.

14  Q.  As far as you're concerned, his wife or his

15  girlfriend was not involved in anything?

16  A.  I don't know.

17  Q.  Okay.  Regarding whether there was any weapons in

18  the vehicles, do you know if --

19          THE COURT:  There weren't.  We just had that

20  one.  We just had the one that he's saying is, quotes,

21  associated with vehicle 1.  That's all we got.

22          MR. ACEVEDO-CARLSON:  Understood.

23          THE COURT:  So there isn't any.

24  BY MR. ACEVEDO-CARLSON:

25  Q.  Do you have any knowledge as to what HPD's

1    participation was at the bust?

2    A.   Oh, yes, I know very exact knowledge.  So --

3           THE COURT:  So yes, yes, he knows.  Now ask

4    him another question.

5           MR. ACEVEDO-CARLSON:  Good.

6    BY MR. ACEVEDO-CARLSON:

7    Q.   The FBI didn't conduct a search of the vehicles.

8    Do you have any knowledge as to whether HPD did a

9    preventive search?

10   A.   So HPD was operating at the discretion of the FBI.

11          THE COURT:  Do you know -- so this is

12   frustrating.  Ask your question again.

13   BY MR. ACEVEDO-CARLSON:

14   Q.   You've already mentioned the FBI has not conducted

15   a search.

16          THE COURT:  Did HPD conduct a search?

17   BY MR. ACEVEDO-CARLSON:

18   Q.   Did HPD conduct a security search?

19          THE COURT:  Did they?

20   A.   To my knowledge, I don't believe so.  I believe

21   they just checked to see if there was people in the

22   vehicle.  They weren't searching for items.

23          MR. ACEVEDO-CARLSON:  We pass the witness,

24   Your Honor.

25          THE COURT:  Redirect?

1          MR. LEO:  No redirect, Your Honor.

2          THE COURT:  All right.  You can step down.

3              Are you done?

4          MR. LEO:  I am, Judge.

5          THE COURT:  Ms. Bagshaw, do you have any

6  witnesses or evidence?

7          MS. BAGSHAW:  No, I don't.

8          THE COURT:  Mr. Berg?

9          MR. BERG:  No, Your Honor.

10         THE COURT:  Mr. Martinez?

11         MR. MARTINEZ:  No, Your Honor.

12         THE COURT:  Mr. Vasquez?

13         MR. VASQUEZ:  I just have some documents I'd

14  like the Court to take a look at.

15         THE COURT:  Why don't you just tell me what

16  they are first.

17         MR. VASQUEZ:  So, Judge, I have documents from

18  Immigration, a Notice to Appear, as well as his release

19  from immigration custody back in 2022, where he was

20  released on his own recognizance under conditions.

21             I also have documents from the District

22  Attorney's Office of Riverside, California, where

23  Mr. Rodriguez is a victim in a case out there where

24  he's been asked to come in and testify, as well as his

25  medical records have been requested by the District

1  Attorney's Office in Riverside, as he and his brother

2  were both victims of a shooting.  And a subpoena for

3  those medical records, as well, Judge.

4          THE COURT:  All right, you can just hand those

5  up to Jason.

6              Do you have any objection to these as

7  exhibits to this hearing?

8          MR. LEO:  I do not, Your Honor.  And I've seen

9  them.

10         THE COURT:  Anything else, sir?

11         MR. VASQUEZ:  No, Your Honor.

12         THE COURT:  Mr. Troiani?

13         MR. TROIANI:  No, Your Honor.

14         THE COURT:  Ms. Soderlund?

15         MS. SODERLUND:  None, Your Honor.

16         THE COURT:  Mr. DeGeurin?

17             You've got to give up the podium, Mr. Leo.

18         MR. DEGEURIN:  It's okay, I'll move over here.

19         MR. LEO:  No, you can use the podium.

20         THE COURT:  It's not yours.

21         MR. DEGEURIN:  I don't have a work space,

22  Judge.

23         THE COURT:  You can sit on the bench.

24         MR. DEGEURIN:  Judge, I would like to admit

25  Defense Exhibit 1, which it is his -- it is

1    Mr. Berbin's -- I'm going to spell it again for the

2    record.

3                THE COURT:  I got it.

4                MR. DEGEURIN:  Okay, where he was paroled in

5    on September 5, 2023; that he has a hearing date of May

6    21, 2026; that as of this morning, he has lawful access

7    to the country.

8                THE COURT:  Do you have any objection to this

9    exhibit?

10               MR. LEO:  No, Your Honor.

11               THE COURT:  All right, hand it up.

12                Jason, make sure you mark whose exhibits

13   these are.

14               MR. DEGEURIN:  Judge, and on that

15   documentation is going to be the correct spelling of

16   his name.  I gave it to you earlier.

17                I would proffer the testimony of his

18   girlfriend, who was interviewed by Pretrial Services,

19   that he lives with her in the apartment.  He has a job,

20   that if he were released, that he could go back to the

21   apartment and he would be able to continue to work.

22                I don't know what the status is going to

23   be.

24               THE COURT:  What about this whole idea that

25   the girlfriend says that that isn't true?

 1          MR. DEGEURIN:  Well, I believe that they have

 2  re-interviewed.  I received a phone number.  I called

 3  that woman, the woman who is his girlfriend, and they

 4  have her mis-identified.  I think they interviewed --

 5          THE COURT:  Yajaira Espinosa Castro.

 6          MR. DEGEURIN:  Right.  The actual person who

 7  is his girlfriend, I provided to the Pretrial Report,

 8  I think they put the wrong name because he has been

 9  living with her, and he's lived there for the last

10  seven months.

11          THE COURT:  With her, who, Castro?

12          MR. DEGEURIN:  Well --

13          THE COURT:  Or this other girl?

14          MR. DEGEURIN:  Do you have the -- Judge,

15  there's an updated that you may not even have.

16          THE COURT:  Yeah.  No, I don't have an updated

17  report.

18          MR. DEGEURIN:  I'll let you review it, Judge.

19  There was just a misunderstanding between the name;

20          THE COURT:  [Rocillo Viera].  Okay, go ahead.

21          MR. DEGEURIN:  And that if he were released,

22  he would be living there with her, her mother, and a

23  nephew.

24          THE COURT:  All right.

25          MR. DEGEURIN:  Currently, Judge, I don't

 1  have -- I can't provide anything more than what I've

 2  provided to you about the current status, other than

 3  what the agent said on the stand about his --

 4          THE COURT:  It seems to me they all have

 5  something going on.  They've all got some kind of

 6  status.

 7          MR. DEGEURIN:  I'll save it for argument, but

 8  as of this morning he has permission to be in this

 9  country.  He has --

10          THE COURT:  I know.

11          MR. DEGEURIN:  Okay.

12          THE COURT:  I know, I got you.  Anything else?

13          MR. DEGEURIN:  I'm sorry, that's it.

14          THE COURT:  All right.  Mr. Mosbacker?

15          MR. MOSBACKER:  No, Your Honor.

16          THE COURT:  Mr. Acevedo?

17          MR. ACEVEDO-CARLSON:  Not at this time, Your

18  Honor.  Thank you, Your Honor.

19          THE COURT:  I understand the law about mere

20  presence.  I've made that argument many times.  And as

21  to none of them is this mere presence.

22              There is at least some evidence that

23  there was two meetings setting up a deal, that there's

24  texting, that there's sharing of location information,

25  there's immediate showing up to a location where there

1    is what definitely looks like a drug transaction.

2    There is the visible exchange of money.  There is the

3    visible exchange of pelican cases.  And then there is a

4    bust.  Several people fled.

5                    I think that the argument about who knew

6    what exactly and when is going to be something that

7    you're going to argue at trial.  Probable cause is a

8    much lower standard.  It's even lower than

9    preponderance.  There's at least some evidence to

10   believe that each of these defendants agreed with at

11   least one or more of the other defendants and at least

12   as to the ones that were at the meetings agreed with

13   sources, alleged sources of supply.

14                    There is a conspiracy and so I'm finding

15   probable cause.  And I already know -- I mean,

16   honestly, I think I know your argument on detention.

17   I've heard  you argue these very same -- I mean, do you

18   need to point anything out to me other than what's in

19   the Pretrial Reports, or other than what's in the

20   evidence?  I mean, I listened; okay?

21           MR. LEO:  No.

22           THE COURT:  Okay.  And I promise each of you,

23   I spent half the day yesterday in my office reading

24   these reports.  I mean, I don't just come to these

25   hearings, you know, unprepared.  So I know what's in

 1  the reports, but each one of you, starting with

 2  Ms. Bagshaw, make your argument.

 3          MS. BAGSHAW:  Yes, Your Honor.  The Court

 4  already mentioned you're taking judicial notice of the

 5  Pretrial Reports.

 6          THE COURT:  Right.  All the facts in the

 7  reports therein.

 8          MS. BAGSHAW:  Right.

 9          THE COURT:  So just tell me what you want me

10  to know.

11          MS. BAGSHAW:  So, Mr. Correa -- I'll refer to

12  him as Correa for purposes of argument, he did -- he's

13  from Venezuela, he's only 23 years old.  He was an

14  asylum seeker and is here released on bond awaiting

15  scheduling not until March of 2027.  He has been

16  working for the past four years that he's been in

17  Houston.  He does have significant ties to the

18  community in that he lives with his sister and his

19  common law wife.  They have three children together

20  that are all very young:  Seven, three, and one.

21          THE COURT:  Is that Ms. Fuentes?

22          MS. BAGSHAW:  Yes, Judge.

23          THE COURT:  The one that's the victim of the

24  aggravated assault charge?

25          MS. BAGSHAW:  That is correct, Judge.  She's

1  the complainant in that case.  If you want me to

2  address that, I can get into that now.

3           THE COURT:  I just know that he's on deferred

4  adjudication for that as we speak.

5           MS. BAGSHAW:  They have not filed a motion to

6  adjudicate, but I assume --

7           THE COURT:  But he's under conditions.

8           MS. BAGSHAW:  -- that will be --

9           THE COURT:  All right.

10           MS. BAGSHAW:  Yes, Your Honor.  And he was set

11  to be finished that two year term in November of this

12  year with no prior motion to adjudicate for violations

13  having been filed.

14           One of his children does have ██████ and

15  he is the sole provider for all of the children.

16           I know there was something in the Pretrial

17  Report about the wife not wanting him to return.  But

18  the home is the home that he shared with his biological

19  sister.  And I have had conversations with the wife,

20  that I would just proffer that she is supportive of him

21  being out.  She wants that support.  And as far as my

22  understanding, they are still together.  The conditions

23  of the deferred just said no threatening or harassing

24  contact.  It didn't say that they couldn't have

25  contact, even though she was the complainant.

```
 1              THE COURT:  All right.  Well, I'll disregard
 2   that statement in the report.
 3              MS. BAGSHAW:  Thank you, Your Honor.
 4                   As far as the conditions that could be
 5   set, you know, we could have strict monitoring
 6   conditions to allow him to return to work.  There is
 7   the misdemeanor assault that we've already addressed,
 8   but he --
 9              THE COURT:  It's a felony.
10              MS. BAGSHAW:  It was actually reduced to a
11   misdemeanor for purposes of the plea, but you're
12   correct that it was in Felony Court.  I pulled the
13   judgment.  I can file it.
14              THE COURT:  Was it punished as a misdemeanor
15   or reduced to a misdemeanor?
16              MS. BAGSHAW:  It was -- the judgment says
17   misdemeanor assault family member.
18              THE COURT:  All right.
19              MS. BAGSHAW:  And the -- I lost my train of
20   thought.  His criminal history does not involve any
21   drug cases, does not involve any firearms cases.  And
22   if I can briefly turn to the firearms, unless did you
23   want to --
24              THE COURT:  Well, I'm finding probable cause
25   on that.
```

```
 1           MS. BAGSHAW:  Okay.

 2           THE COURT:  That's clear.

 3           MS. BAGSHAW:  I understand, Your Honor.

 4               As far as that goes, there's one

 5   transaction that he's actually present for.  We heard

 6   a little bit about the text message account.  That's a

 7   different name not even associated with him and two

 8   different people who have actually showed up to those

 9   transactions.  So we'd ask that he be able to have a

10   bond, to be able to be at  home with his family and

11   continue to provide as he has been while we fight these

12   charges.

13           THE COURT:  All right, thank you.

14               Mr. Berg?  Mr. Berg?

15           MR. BERG:  Pretrial recommends release,

16   50,000 unsecured with monitoring.  I think under the

17   circumstances that's appropriate.

18           THE COURT:  I can't hear you.  Just speak up

19   is all.

20           MR. BERG:  Okay.  I'm doing my best.

21           THE COURT:  Or sit down and pull the mike up.

22   I don't care.  You can sit down.

23           MR. BERG:  How's that?

24           THE COURT:  It's good.  You can sit.

25           MR. BERG:  Okay.  Pretrial recommends 50,000
```

1  unsecured with monitoring, and I think that's

2  appropriate.  My client is employed.  He works as a

3  plumber.  He supports his common law wife and her

4  children.

5           He has resided in the country for four

6  years, one year in California and three years here.

7  He entered at Piedras Negros and declared himself, so

8  he's not here unlawfully.  He was paroled in.  And of

9  course, we never know what's going to happen with that

10 these days, but he's not a risk of flight.  Like many

11 cases, he's a risk of staying.  He's not trying to

12 flee.  He did not try to flee this night.  He was the

13 one that stayed put and listened to the conditions.

14          And given the relative weakness of the

15 case against him, as opposed to some of the others, and

16 absolutely no evidence that he's associated with Tren

17 de Aragua or anti-Tren or any other organized group, I

18 would submit he is not a danger to the community.  He

19 has no prior record.  And he's not a risk of flight.

20 He's got significant ties to the community that rebuts

21 any presumption.  And I'd ask that he be released.

22          THE COURT:  All right.  Mr. Martinez?

23          MR. MARTINEZ:  Yes, Your Honor.  Thank you.

24          Mr. Davila has a pregnant girlfriend.

25 She's four months pregnant and that, I would argue, is

1  some tie to this community.  He's been working in the

2  United States.  He's a mechanic.  Doesn't really have a

3  criminal history.  His only other arrest is a

4  misdemeanor theft and that charge was rejected by the

5  DA's office.  So he's got no prior convictions.

6             No suitcases, no money, no guns on his

7  person when he was arrested.  So we'd ask the Court to

8  set reasonable conditions of release.  Thank you.

9          THE COURT:  Thank you.

10             Mr. Vasquez?

11          MR. VASQUEZ:  Judge, we'd be asking for

12  release as well.  Mr. Rodriguez-Garcia did enter the

13  United States.  He declared himself, he was paroled

14  out.  The only criminal history that it shows is that

15  7/9/22 arrest where he was detained by Immigration, but

16  as I provided to the Court, he was released on parole

17  on that case pending the outcome.

18             We also have the documentation from Los

19  Angeles showing where he is a victim of a crime.

20  Since that crime has occurred, he has also applied for

21  a U-visa.  As the Court is aware, the U-visa is for

22  victims of crimes.  As of yet, we do not have the

23  status on that.  We're waiting to see where that goes.

24             He does have his wife here.  I know

25  there's a question as to where he's going to be

1  staying.  I did confirm with him that the address that

2  the wife provided is the sister's address.  I have a

3  phone number for both the sister and the wife.  I've

4  been trying to communicate with them.  I have

5  communicated with them.  I tried to get them this

6  morning to clarify, but unfortunately I was unable to

7  reach them during the hearing.

8            He has no criminal history.  I did ask

9  him about his passport.  He indicates to me that he

10 believes his passport is in his vehicle, which, if I

11 can get access to his vehicle, I should be able to find

12 his passport.

13            Yes, he does have the children, but the

14 children are staying with their grandmother and the

15 biological mom of the one dependent.  We believe that

16 with proper monitoring, ankle monitoring, he would

17 remain in the United States.  I'll do every effort I

18 can to locate  that passport, as well, to turn that in.

19            He's got no criminal history at all.  I

20 don't believe the Government has met its presumption

21 in this case.  And the only admitted use, drug use, is

22 marijuana.  Of course with testing, the Court that that

23 can be a deterrent as well.  And Mr. Rodriguez-Garcia

24 understands that if he tests positive for marijuana,

25 any bond that he does have could be revoked.

1          Like I indicated, Judge, he does have his

2     wife and his sister both in Houston, so he has ties to

3     the community.  He also works as an independent

4     contractor doing construction work.  He would continue

5     to work pending the resolution of this case.

6          So we believe that there are conditions

7     that the Court could impose to assure that he comes

8     back to court and comply with any conditions that the

9     Court may impose.

10          THE COURT:  Thank you.

11          Mr. Troiani?

12          MR. TROIANI:  Your Honor, we are also asking

13     the Court to impose a $50,000 unsecured bond.  My

14     client has at least two years in the community.  He

15     has six months at an address where he's been living.

16     He's employed as a Lyft driver.  He has no criminal

17     history.  He supports his family who does live in

18     Venezuela.  He also has indicated that he fears to

19     return and is seeking asylum here in the United States.

20          And ELM is available, home detention, you

21     know, it's also confinement can be imposed, as well.

22     And there is some marijuana usage, but that can also be

23     addressed through treatment and testing.

24          Thank you.

25          THE COURT:  Ms. Soderlund?

1    MS. SODERLUND:  Thank you.

2        Mr. Hernandez Delgado is a very young man

3    and he's single, no children.  He has a stable living

4    arrangement with a good friend who has confirmed all of

5    his biological information.  And he does have a

6    criminal history consisting of a misdemeanor.  That was

7    in 2024.  They placed him in detained proceedings in

8    Immigration Court.

9        I would like to clarify something about

10   the 1/9/24, 5/10/24 information that appears on page 3

11   of his report.  When he was transferred after serving

12   his confinement in Harris County, again, he was placed

13   in detained proceedings.  He was granted voluntary

14   departure on March 14, 2024 by the Conroe Immigration

15   Court.

16       Ever since then, he was free because

17   voluntary departure -- you know what it is, Your

18   Honor.  They have to report and leave.  Well, he's

19   been reporting with EOIR enforcement, I mean, mobile

20   operations with ICE because he hasn't been able to

21   leave for some reason.  So he has been under the radar,

22   directly supervised by these people, and he was out

23   working when he was then arrested and charged.

24       He has a history of using marijuana, but

25   again, he's only 19 years old, Your Honor.  I believe

1    that an institutional environment, federal detention

2    would not be conducive of his straightening out or

3    rehabilitating himself.  He's young enough if he's

4    placed outside on whatever conditions the Court may

5    find.  Again, he hasn't left.  He hasn't left for

6    Venezuela.  He doesn't want to leave, he wants to stay

7    here.  He could be receiving some sort of treatment

8    outside, Your Honor, so that he can rehabilitate

9    himself.  He's young.

10                And he has a history of employment that

11   was corroborated, Your Honor.  So, if he goes back, he

12   can work, be placed in whatever conditions, ankle

13   monitoring, if time restrictions are considered an

14   option by the Court, so he can just go back outside,

15   receive some outpatient treatment, and then address

16   this case and the charges against him with counsel.

17                Thank you.

18           THE COURT:  Thank you.

19                Mr. DeGeurin?

20           MR. DEGEURIN:  Mr. Berbin has no criminal

21   history, and that's testified by the FBI Agent.

22   There's no indication prior to this arrest of any

23   involvement in any crime, even any suspect of a crime.

24   No ties to any gang, no anything other than his arrest

25   on this.  There were no firearms found on Mr. Berbin.

114

1  There is -- I think it defies credibility that they

2  didn't at least do a protective sweep of the cars, of

3  car 6.

4          THE COURT:  You're going to find out.

5          MR. DEGEURIN:  But either way, there is no

6  firearm tied to Mr. Berbin or the other person in the

7  car.  He said in the testimony that he was doing a job.

8  A job could be many different things.  It was not a --

9  I don't know how they thought that doing a job was

10  incriminating because he was there as a passenger in a

11  car.  He showed no other ties anywhere else to the

12  people that are charged in the top of this complaint or

13  part of any conversation, or any of the pre-meetings.

14  The Court is well aware of the people who were in those

15  meetings.  It was not Mr. Berbin.

16          Without any criminal history, without any

17  firearms, without any other information, I think we

18  have rebutted the presumption.  Therefore, I'm asking

19  the Court, then, to now look to see about setting

20  conditions that would allow him pretrial release.  I

21  believe that with an unsecured bond, with a GPS

22  monitoring, the Pretrial could monitor him.

23          It goes without being said, Judge, that

24  the people who have fled Venezuela are not trying to

25  flee back to Venezuela.  They're here because they are

1  seeking asylum.  What you have before you as Exhibit 1

2  shows that Mr. Berbin has been in -- he spent a year in

3  Mexico, or six months to a year in Mexico before he was

4  admitted into this country.  He was paroled in and he's

5  been in contact with Immigration waiting his time to

6  get in front of an Immigration Judge for asylum.

7           Now, the agent is saying that they moved

8  to revoke or to take away his parole.  They can't just

9  do that.  They can't just say we -- they have to have a

10  reason to do so.  And if they're saying that the reason

11  they're going to do it is because of this charge, well,

12  the evidence is what you have.  It's that they don't

13  have anything.  They have him as mere presence.

14           Now, I understand that we're talking about

15  a lower standard when we're talking about at trial.

16  But when you're considering conditions of bond, you're

17  considering the strength of the case, too.  And the

18  strength of the case against Mr. Berbin at this time is

19  very weak, other than his presence.  It gets you past

20  probable cause like the Court has found, but it does

21  not get you to a reasonable doubt.  It doesn't even get

22  you to clear and convincing.  It doesn't get to those

23  things.

24           And that's something that this Court can

25  consider in setting a bond.  And I ask you to set an

1    unsecured bond similar to what is being recommended in

2    another defendant's case of $50,000, with a GPS

3    monitoring, for him to live with his girlfriend and his

4    girlfriend's mother at the apartment on Westheimer.

5              THE COURT:  All right.

6                    Mr. Mosbacker?

7          MR. MOSBACKER:  Yes, Your Honor, I would ask

8    that Pretrial Services interview Mr. Fernandez Troconiz

9    again.  He was nervous the first time, didn't give them

10   detailed information.  He now has some detailed

11   information about where he's living currently or where

12   he was living currently.

13                    Also, detailed information about his work

14   for contractors.  He has their first name and telephone

15   numbers, and they can be contacted to verify his

16   employment.  So I would ask that this be passed for a

17   day so that Pretrial Services can re-interview

18   Mr. Fernandez Troconiz, Your Honor.

19             THE COURT:  Do you object to that?

20             MR. LEO:  No.

21             THE COURT:  Fine.  You're continued.  Come

22   back tomorrow at 10:00.

23             MR. MOSBACKER:  Yes, Your Honor.

24             THE COURT:  Mr. Acevedo.

25             MR. ACEVEDO-CARLSON:  Thank you, Your Honor.

1          The Government has no evidence to show

2   that my client is not here with permission of the

3   United States Government.  I know that you're taking

4   judicial notice of the Pretrial Report.  I'd just like

5   to clarify, on page 1 there's a highlighted sentence

6   that says, "however" -- at the middle of the paragraph

7   on page 1 at the bottom that says, "However, he was

8   granted an employment authorization document and

9   appears to have an application pending."  I think that

10  refers to an asylum application pending, but the word

11  "asylum" isn't there.

12          My client has no prior criminal history

13  in the United States, no violence, no indicia that he

14  was intending to commit any violence against anybody

15  involved in any of the conversations that the agent

16  testified about.  He has no criminal history in Harris

17  County, in Texas or anywhere in the United States.

18          He was lawfully working when this

19  occurred.  The Pretrial Report points how much he was

20  making.  There's a lot of speculation about grenades.

21  I think that's all hyperbole.  At the end of the day,

22  they can't even say that he had a weapon on his person

23  when there was an arrest.

24          We would ask respectfully, Your Honor,

25  that you consider that if he gets back to his house

1    where he's living with Ms. Alva Castro at the address
2    pointed out in the Pretrial Report, he'd be in a
3    position to be able to work and not only support his
4    family here and in Venezuela, but assist in the payment
5    of the attorney's fees so he could continue with
6    representation during the course of this case.
7              We would respectfully ask that any and
8    all conditions that the Court wants to consider being
9    imposed on him, he will abide by those conditions.  I
10   would suggest house arrest with a GPS monitoring system
11   and a secured bond of no more than $50,000.  We'd also
12   like to point out, Your Honor, that he's applied --
13   voluntarily applied to go into the Army and provide
14   services to the United States and the Armed Forces.  He
15   has been rejected because of his immigration situation,
16   which could be resolved if the asylum petition is
17   granted.
18             And although the asylum petition, when
19   it's heard by USCIS, may take into consideration that
20   he has been arrested.  It is not a determining factor
21   whether he is going to the asylum or not.
22             Thank you, Your Honor.
23        THE COURT:  All right.  Well, the presumption
24   aside, just all of them have a lot of things in common.
25   I'm not going to go through everybody individually.  I

1  will do that in writing, but they are all a presumption
2  case.  And even if you rebut the presumption, the
3  presumption still carries with the case.  It's a
4  serious case, it's a mandatory minimum of 10 years.
5             The presence of a gun creates problems for
6  all of them since it's a conspiracy.  All of them are
7  fairly young except for one who's in their thirties,
8  but they're all fairly recently in the United States.
9  They all spent, you know, their formative years in
10 Venezuela.  None of them want to go back to Venezuela.
11 And it's kind of counter-intuitive, but that's a
12 problem.  There's no good reason for them to show up to
13 court and face a conviction in this case so that they
14 can then, when that's done, be deported to Venezuela or
15 wherever else these days.
16            None of them have significant assets or
17 liabilities, although most of them report some kind of
18 employment.  There's not a whole lot holding them here
19 and there's a whole lot of reasons to not show up.
20            This whole idea that they have status or
21 applications, that's all in grave jeopardy at this
22 point given this case.  And I do find probable cause at
23 this point.  I don't find that it's mere presence.
24            I'm not going to sit here and tell you
25 that it's the strongest case in the world, but the

1  whole idea of probable cause is, is there a reason for

2  the case to continue?  Is there a reason for the

3  Government to continue looking at phones and searching

4  cars and doing all of that.  And, I mean, I find, yes,

5  that's not a statement of anything.  It's just -- it's

6  me applying the law.

7             And I find that there's no danger issues.

8  So to the extent there is an appeal of this, I am

9  finding that danger is simply not an issue.

10            There's allegations of gang membership,

11 but, you know, I generally consider the conduct that's

12 before me, not some inference that there might be other

13 conduct, given the membership in some gang.

14            And by the way, at least four of them

15 fled, which I'll put that in my order, as well.  So,

16 like I said, I find probable cause and we'll come back

17 tomorrow on Mr. Hernandez Troconiz, and I'll look and

18 see what else he tells Pretrial and see if that changes

19 things.  But for those reasons and others that I'll

20 detail in separate detention orders, they are all

21 detained pending trial.

22            Anything else from anybody?

23        MR. LEO:  Nothing from the Government.

24        THE COURT:  All right.  Everyone is excused.

25 Thank you.

1          COURT CLERK:  Judge, *Brady*.

2          THE COURT:  Oh, wait, wait, wait.  Apparently

3  I didn't do the *Brady* order.  So the United States is

4  ordered to comply with *Brady vs. Maryland.*  Failure to

5  do so will result in sanctions.

6          MR. LEO:  Understood, Your Honor.

7          THE COURT:  All right.  With that, you're

8  excused.

9          *[12:44 p.m. - Proceedings adjourned]*

10

11              C E R T I F I C A T I O N

12

13     I certify that the foregoing is a correct

14  transcript of the electronic sound recording of the

15  proceedings in the above-entitled matter.

16

17

18  /s/ Gwen Reed

19  7-30-25

20

21

22

23

24

25